Steven Hale Levin
Fed. Bar No. 28750 (*pro hac vice*)
Levin & Curlett LLC
201 N. Charles Street, Suite 2000
Baltimore, Maryland 21201
Phone: (410) 685-0078
Facsimile: (410) 685-2222
Email: slevin@levincurlett.com

Craig S. Denney
Bar No. 244692
Snell & Wilmer L.L.P.
50 W. Liberty Street
Suite 510
Reno, Nevada 89501
Email:  cdenney@swlaw.com

*Attorneys for Mr. Bridges*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO.  3:15-CR 00319–001 RS** |
| | : | |
| **SHAUN W. BRIDGES** | : | |
| | : | |

**...oOo...**

**SENTENCING MEMORANDUM**
**ON BEHALF OF SHAUN W. BRIDGES**

1

## **TABLE OF CONTENTS**

2

3    INTRODUCTION ................................................................................................ 3

4    MR. BRIDGES'S PERSONAL HISTORY ........................................................ 3

5    LEGAL ARGUMENT ....................................................................................... 5

6        A.  The Nature of the Offense ................................................................. 6

7        B.  The History and Characteristics of Mr. Bridges  .............................. 9

8            1.  Mental Health ............................................................................. 10

9        C.  The Need to Provide Restitution ...................................................... 11

10    CONCLUSION ................................................................................................ 11

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shaun W. Bridges comes before the Court for sentencing on December 7, 2015, after having pled guilty to two charges relating to his theft of bitcoins.  Although Mr. Bridges's advisory guidelines range suggests a term of imprisonment of 57 to 71 months, the factors set forth in 18 U.S.C. § 3553(a) ("§ 3553(a)") suggest that a sentence no greater than 36 months would be appropriate in this case.  In a case like this one, where the defendant, a first-time offender, has exhibited extraordinary remorse and commitment to his community, and the loss amount does not correspond to any benefit to the defendant, it is appropriate to consider a variance from the advisory guidelines.

## INTRODUCTION

Mr. Bridges stands before this Court as a man of exceptional professional accomplishment. Prior to his national disgrace, he was widely respected and well-liked by his professional colleagues and in the community.  This proceeding marks the final chapter of a profound tragedy, for Mr. Bridges, his family, and his friends and community – and for the United States Secret Service, to which he devoted a large part of his professional life.

Mr. Bridges recognizes that the crimes he committed are serious, and he has fully accepted responsibility for his actions by immediately cooperating with law enforcement after being charged, by pleading guilty, and by making restitution of approximately $500,000.00.  For his misconduct, Mr. Bridges will be punished harshly: imprisonment and crippling financial obligations, not because of the amount still owed, but because of Mr. Bridges' loss of potential livelihood.  A sentence of 36 months' imprisonment sufficiently reflects the seriousness of the offense, and at the same time takes into consideration Mr. Bridges' prior life of accomplishment, commitment, sacrifice, and integrity, and in particular the contributions he has made to the law enforcement community.

## MR. BRIDGES'S PERSONAL HISTORY

There is much more to Mr. Bridges than the conduct surrounding his offense.  Mr. Bridges fully understands the gravity of this situation and his culpability.  While he offers no excuses for his conduct, undersigned counsel will provide the proper context which led Mr. Bridges to transfer money unlawfully into his account.

1       Prior to the circumstances that led to his guilty plea, Shaun Bridges was the

2   personification of the American dream.    He was raised in a military family and, as discussed

3   later, overcame great obstacles.  His parents retired from the United States Air Force, having

4   served a combined 50 years.  Mr. Bridges spent much of his childhood moving from one place to

5   another.  After his mother retired, the Bridges family settled in Maryland, where Mr. Bridges

6   obtained a Bachelor of Science degree at Towson University in 2005.  To his credit, Mr. Bridges

7   completed his degree – as the "Most Distinguished Scholar" - while employed with law

8   enforcement.

9       Mr. Bridges began his law enforcement career in 2003 with the Laurel (Maryland) Police

10  Department.  When his supervisor retired and took a job on the Anne Arundel County Sheriff's

11  Office (AACOSO) executive team, he asked Mr. Bridges to join him, which he did.

12      During Mr. Bridges's tenure with ACCOSO, he served as a Crisis Negotiator and worked

13  within the Fugitive Apprehension Section.  In 2006, Mr. Bridges joined the Maryland State Police

14  (MSP), graduated first in his class, and asked to be assigned to the Annapolis State Police

15  Barracks.

16      After a brief period, Mr. Bridges transferred to the Criminal Investigation Division with

17  the MSP.  At the time, he was the most junior member of the department to be placed into an

18  investigative role.  His responsibilities also included working on the Baltimore City Task Force

19  apprehending prison escapees and violent fugitives.

20      In 2009, Mr. Bridges was personally selected by the Governor's Office to represent MSP

21  on the U.S. Marshals Capital Area Regional Fugitive Task Force.  In this capacity, Mr. Bridges

22  apprehended the most violent fugitives within the U.S. Capital Region.

23      Mr. Bridges also served as a Firearms Instructor and as a Hostage Negotiator, having been

24  trained by the FBI.  Along with his colleagues, Mr. Bridges successfully negotiated a number of

25  hostage situations.  Attached is an example of but one of many of those situations. (Exhibit A).

26      While working for the Maryland State Police, Mr. Bridges attended graduate school at

27  Catholic University of America in Washington, D.C., obtaining a Master of Science in 2009.

28  ///

1    In 2009, Mr. Bridges joined the United States Secret Service (USSS), again graduated first

2    in his class, and was assigned to the Baltimore Field Office.  In addition to his work in the

3    forensic lab, Mr. Bridges also held joint roles in protection assignments traveling with the

4    president, Vice-President, and with many foreign heads of state.

5    In 2014, Mr. Bridges was selected by the USSS HQ to serve as the first full-time agent to

6    the National Security Agency.  In this capacity, he represented the USSS in connection to

7    investigations that had an international nexus or cyber security concerns.   Attached are a number

8    of certificates and awards that Mr. Bridges earned over a professional lifetime of achievement.

9    (Exhibit B).

10   In addition to his professional accomplishments, Mr. Bridges volunteered his time for 15

11   years teaching martial arts to children in the public school systems in Anne Arundel County,

12   Prince George's County, and Howard County (Maryland).  Although the position was a "paid

13   position," Mr. Bridges never accepted even one dollar of pay in those 15 years, volunteering to do

14   it for free to help elementary-age children to instill in them a sense of self-worth and discipline.

15   **LEGAL ARGUMENT**

16   In *Gall v. United States*, 552 U.S. 38, 50 (2007), the Supreme Court stated that a district

17   court "may not presume that the Guideline range is reasonable," but rather "must make an

18   individualized assessment based on the facts presented."  A sentence in the advisory Guideline

19   range is not presumed to be reasonable. *Nelson v. United States*, 555 U.S. 350 (2009) (*per*

20   *curiam*).  Instead, the advisory Guideline range is but one factor to be considered in determining a

21   sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552

22   U.S. 85, 101 (2007) (*quoting* § 3553(a)); *see also United States v. Gardellini,* 545 F.3d 1089,

23   1091-92 (D.C. Cir. 2008).

24   Furthermore, the *Gall* Court rejected the idea that "extraordinary circumstances" are

25   required to justify a sentence outside the Guidelines sentence range. *Gall,* 552 U.S. at 47.  Finally,

26   the Court rejected the use of rigid mathematical formulas to determine whether a variance from

27   the Guidelines' sentence range is justified. *Id.*

28

1    Accordingly, after calculating the proper offense level under the Guidelines and giving the

2    government and the defense the opportunity to argue for the sentence they believe to be appropriate,

3    the district judge must consider each of the § 3553(a) factors and "tailor the sentence" to fit the

4    circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005); s*ee also United*

5    *States v. Smith,* 566 F.3d 410, 414 (4th Cir. 2009); *United States. v. Pauley*, 511 F.3d 468, 473

6    (4th Cir. 2007).

7    This approach has been adopted by the United States Sentencing Commission in the

8    amendments to the Guidelines effective November 1, 2010.  USSG § 1B1.1 recommends that the

9    district courts use a three-step approach to sentencing, which includes: (1) properly calculating the

10   advisory Guideline range; (2) referring to the Guidelines Manual and considering whether the case

11   warrants any departures; and (3) considering the factors under 18 U.S.C. § 3553(a) as a whole to

12   determine if a variance if appropriate.  The § 3553(a) factors include:

13       (1)    the nature of the offense and history and characteristics of the defendant;
         (2)    the purpose of sentencing;
14       (3)    the kinds of sentences available;
         (4)    the Sentencing Guidelines;
15       (5)    the policy statements issued by the Sentencing Commission;
         (6)    the need to avoid unwarranted disparities among similar offenders; and
16       (7)    the need to provide restitution to any victims of the offense.

17   In this case, the factors strongly counsel in favor of a sentence below the estimated guidelines

18   range.  We address the most relevant factors in turn.

19       **(i)    The Nature of the Offense**

20       Though the ramifications to both Mr. Bridges and his former agency have been

21   tremendous, this is in essence a theft case.  Mr. Bridges was an early investor in bitcoins, and he

22   even encouraged family members to invest.  He also discussed his investment with a number of

23   former colleagues, to include his supervisor and the Office of General Counsel in 2012.[1]   In

24   January 2013, while in Utah, Mr. Bridges believed that someone had accessed his bitcoin wallet

25   and stolen his family members' investment, which, at that time, had grown to approximately

26   $175,000.00.   Upon learning of the theft, Mr. Bridges made the tragically poor and abrupt

27   ─────────────────
     [1] One of Mr. Bridges's lawyers interviewed former colleagues of Mr. Bridges in February 2015, at least
28   three of whom confirmed that these discussions regarding an investment in bitcoins occurred in 2012 –
     prior to the theft.

1    decision to steal from a Silk Road account.  At the time Mr. Bridges committed the theft, the

2    stolen bitcoins' value was approximately $350,000.00.   Over time, the value increased to

3    approximately $800,000, resulting in a significantly higher guidelines range.

4         Once Mr. Bridges stole the bitcoins, he knew there was no going back and, foolishly, dug a

5    deeper hole.  Rather than keep the money in the bitcoin wallet, Mr. Bridges transferred the

6    bitcoins to his Mt. Gox account, registered in his name.  He then transferred the money into his

7    Fidelity account, which was also in his name.  After consulting with his tax attorney, Mr. Bridges

8    transferred over $200,000 from his Fidelity account to a PNC account in his name and that of his

9    spouse, to pay taxes on the capital gains.  With the exception of the money that went to pay state

10   and federal taxes, the money remained in his Fidelity account from the initial deposit over two

11   years ago until recently, when Mr. Bridges made significant restitution to the United States.

12        From the moment Mr. Bridges made the impulsive decision to steal bitcoins from a Silk

13   Road account, the likelihood of charges and the loss of everything for which he had worked hung

14   over him like the Sword of Damocles.  Mr. Bridges knew that eventually, his actions were going

15   to see the light of day.  In part, this expectation explains why Mr. Bridges kept the money in his

16   Fidelity account - so he could return it once his misconduct was discovered.

17        To be clear, the purpose of describing Mr. Bridges's motive is not to justify his actions.  He

18   stole bitcoins.  The costs were considerable, and Mr. Bridges has done and will do everything

19   within his power to help right a wrong that he committed.  The purpose of describing his motive

20   is solely to assist the Court in assessing whether this case falls in the heartland of cases

21   contemplated by the guidelines.

22        Other courts have considered whether the fraud and theft guidelines, which are almost

23   entirely driven by loss amount, set forth an appropriate sentence in particular cases.  For example,

24   in a case in the District of Massachusetts, *United States v. Watt*, 707 F. Supp.2d 149, 155

25   (D.Mass. 2010), the Court stated the following:

26       Loss under the Guidelines is effectively a proxy for evaluating culpability.  Sometimes, it
         is appropriate, and sometimes it is not.  For example, at one point, the background note to
27       USSG Section 2B1.1 suggested that the Guideline drafters believed loss was an appropriate
         proxy because it reflected both "harm to the victim" and "gain to the defendant."  . . ., that
28       was not so here; Watt made nothing from the scheme. (footnote omitted).

- 7 -

1

2       The Court's decision in *United States v Costello*, 16 F Supp 2d 36, 37 (D Mass. 1998),

3  cited in the *Watt* case, is also instructive. There the Court departed downward six points in

4  sentencing two defendants charged with conspiring to steal computer disks, compact disks and

5  computer software from their employer. *See id* at 40. After an evidentiary hearing, the Court

6  found that the amount of loss was in excess of $20 million. The Judge determined, however, that

7  the defendants received at most 1 per cent of the value of the goods, whereas a third conspirator

8  had organized the theft and taken the major part of the proceeds. *See id* at 39. Recognizing that

9  under such circumstances, the amount of loss was not, as the Guidelines assume, an appropriate

10 proxy for culpability, the Court departed downward by six levels.

11      As other courts have recognized, loss calculations can "overstate both the degree of [a

12 defendant's] criminality and his need to be corrected."  *United States v. Stuart*, 22 F.3d 76, 82 (3d

13 Cir. 1994); *see also United States v. Emmeneger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)("The

14 Guidelines place undue weight on the amount of loss involved in the fraud.  This is certainly a

15 relevant sentencing factor:  All else being equal, large thefts damage society more than small ones,

16 create a greater temptation for potential offenders, and thus generally require greater deterrence

17 and more serious punishment.  But the guidelines provisions for theft and fraud place excessive

18 weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the

19 theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the

20 theft of different dollar amounts.  In many cases, including this one the amount stolen is a

21 relatively weak indicator of the moral seriousness of the offense or the need for deterrence.").  Mr.

22 Bridges's case, like the *Stuart* and *Emmeneger* cases, is a situation where the amount of loss is a

23 weak indicator of the moral seriousness of the offense and the need for deterrence.

24      Nevertheless, Mr. Bridges recognizes the serious nature of this offense, sincerely regrets it

25 and accepts complete responsibility for his conduct, and has done everything he can to make

26 amends.  Mr. Bridges has taken every conceivable action to work with the government to try to

27 make the situation right.  This action includes cooperating with and confessing to the agents and

28 prosecutors the first time he appeared in court.  This Court is allowed to consider remorse at

sentencing as a factor supporting a variant sentencing.  *See United States v. Howe*, 543 F.3d 128, 138 (3d Cir. 2008) ("Indeed, a defendant's degree of remorse at sentencing may be considered as a basis for downward variance under Section 3553(a) regardless of whether the defendant previously accepted responsibility.").  Mr. Bridges's acceptance of responsibility and his actions to try his best to correct the harm he caused demonstrate his true remorse even more vividly than the words he will use at sentencing to express his genuine remorse to the Court, the victim and his own family.  Of course, as discussed more fully below, there are grounds other than sincere remorse and immediate acceptance of responsibility that warrant the imposition of a sentence no greater than 36 months.

**(ii)     The History and Characteristics of the Mr. Bridges**

Mr. Bridges's history and characteristics weigh strongly in favor of a variance sentence.  As discussed above, he was a model student and served meritoriously in law enforcement for 12 years.  Though he tried to be a good husband to his first wife, he put his profession before his marriage.  Consequently, the marriage ended abruptly in 2010 when he returned home to find his wife and her lover *in flagrante delicto*.   Nevertheless, Mr. Bridges learned to trust again and remarried.  He has known his current wife for over 10 years, strongly suggesting that his current wife knows him extremely well and believes that he is a good and decent man, notwithstanding his misdeeds.

Mr. Bridges has no criminal history and there is no likelihood of recidivism.

Although few former colleagues were willing to write to this Court in light of the professional consequences that may result, those who have written attest to Mr. Bridges's character.  (Exhibit C).

The common theme that emerges from these letters is that Mr. Bridges is a decent man.  His actions in this case are wholly inconsistent with the behavior and relationships that otherwise define his life. Mr. Bridges's acts of generosity and good deeds appear to span years. His sentence will greatly affect many who have come to rely or depend on him.

The foregoing factors are significant in any § 3553(a) analysis and support a variance in this case. *See, e.g., United States v. Smith,* 275 Fed. Appx. 184, 187 (4th Cir. 2008) (*per curiam*) (*unpublished*) (upholding 11-level downward variance, citing defendant's "lack of criminal

history, low risk of recidivism, and positive role in his family and his community"); *United States v. Pauley*, 511 F.3d at 474 (upholding six-level downward variance, noting that defendant "was deeply remorseful and, besides the criminal conduct at issue, . . . was a good father and teacher"); *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (upholding variance to probation based on defendant's remorse, status in the community, and that he otherwise "led an honorable and lawful life" and was a "devoted husband, father, and son").

With respect to this sentencing factor, Judge Jed S. Rakoff (S.D.N.Y.) eloquently noted in *United States v. Adelson* :

> *...if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed court to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."* [2]

### a. Mental Health

Pursuant to U.S.S.G. §5H1.3 of the Sentencing Guidelines, mental and emotional conditions may be relevant in determining whether a departure is warranted, if such issues, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Likewise, through § 3553(a), Congress has instructed sentencing courts to consider a defendant's need for medical care in fashioning an appropriate sentence.  18 U.S.C. § 3553(a)(2)(D).  Historically, district courts enjoy considerable discretion in a variance and/or departure below the advisory range based on a defendant's mental health problems.  *See, e.g., United States v. Mendez*, 248 Fed. Appx. 653, 661 (11th Cir. 2008); *United States v. Pineyro*, 372 F. Supp. 2d 133 (D. Mass. 2005)(holding defendant entitled to downward departure for physical condition, which included mental health issues); *United States v. Blarek*, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) (granting downward departure to three years supervised release in case where defendant convicted of

---

[2] In December 2009, the Second Circuit affirmed Adelson's sentence in a two page summary judgment (*United States v. Adelson,, 2008 WL 515534 (2d Cir. Dec. 9, 2008)*).

1    conspiracy to commit racketeering and money laundering was HIV positive); s*ee United States v.*

2    *Pallowick*, 364 F.Supp.2d (E.D. Wisc. 2005) (sentencing bank robber who suffered from major

3    depression and anxiety disorder below the guideline range).

4         As reflected in Dr. Blumberg's submission, Mr. Bridges's history of depression, feelings

5    of inadequacy, and impulsive actions contributed to his poor decision-making in January 2013

6    and thereafter.  (Exhibit D, *to be filed separately under seal*).  Fortunately, now that Mr. Bridges

7    has sought help for his ailments, his prognosis is excellent.

8         **(iii)    The Need to Provide Restitution**

9         Although he is in dire financial straits, Mr. Bridges has entered into an agreement with the

10   government to ensure that he makes sincere efforts to make restitution.  Mr. Bridges can be of

11   much more assistance if he is in society earning a salary instead of in prison.

12        Based on Mr. Bridges's employment history, there is good reason to credit his sincere

13   desire to work to assist his family and to compensate the government for its losses.  In fact, in

14   other cases, strong employment histories such as that presented here have been cited as

15   independent reasons for downward variances at sentencing.  *See United States v. Ruff*, 535 F.3d

16   999, 1001 (9th Cir. 2008)(upholding variant sentence of probation with community confinement,

17   instead of guideline range of 30-37 months, on the basis of the defendant's history of strong

18   employment, cooperation and clear remorse, family support, the absence of potential risk to the

19   public and appropriateness of restitution, and mental health issues, where defendant stole

20   approximately $644,000 of medical equipment from his employer and sold it on eBay); *United*

21   *States v. Tomko*, 562 F.3d 558, 570 (3rd Cir. 2009)("[P]robation was warranted because of

22   Tomko's negligible criminal history, his record of employment, his community ties, and his

23   extensive charitable works.").

24                          **CONCLUSION**

25        The consequences of Mr. Bridges's conduct have already been devastating.  After a

26   distinguished career in law enforcement, in 2013, he made an impulsive decision to steal bitcoins.

27   Since that time, he has waited to learn the consequences of his actions.  Those consequences will

28   include imprisonment and financial ruin.   They already include the loss of a career and the loss of

friendships of former colleagues. Mr. Bridges has also suffered from the humiliation and embarrassment that comes with any conviction of a serious crime, particularly for a person of the standing and reputation that Mr. Bridges had enjoyed. Of course, Mr. Bridges knows full well that he brought upon himself the financial hardship and the embarrassment and humiliation that he has suffered, and will continue to suffer. But it is nevertheless true that he has been punished severely.

This Court need not be concerned that Mr. Bridges will ever again violate the law; that would be true irrespective of the sentence imposed. To be sure, the government needs to be able to trust its employees – particularly those in positions of responsibility. But a sentence of no more than 36 months is a high price to pay, particularly given the enormous financial consequences and the extrajudicial punishment that Mr. Bridges has suffered and will continue to suffer.

For all of the reasons described herein, Mr. Bridges respectfully requests that this Honorable Court impose a variant sentence of no greater than 36 months' imprisonment, with a period of home confinement and/or community service, to allow him to make immediate meaningful contributions towards his significant restitution obligation as well as a special condition mandating mental health therapy to allow him to continue to receive treatment he needs.

///
///
///
///
///
///
///
///
///
///

1 │ *///*

2 │       Mr. Bridges further respectfully requests that he be permitted to self-surrender, as remand

3 │ into custody would adversely impact his security classification, and, because of his status as a

4 │ former law enforcement officer, likely result in placement in solitary confinement.

5 │                     Respectfully submitted,

6 │

7 │                   _____/s/_____

8 │                   Steven H. Levin
   │                   Levin & Curlett LLC

9 │                   250 W. Pratt Street
   │                   Suite 1300

10 │                   Baltimore, Maryland 21201
   │                   Tel: 410-545-5871

11 │                   Slevin@levincurlett.com

12 │                   *Attorney for Mr. Bridges (pro hac vice)*

13 │                   Craig S. Denney
   │                   Snell & Wilmer L.L.P.

14 │                   50 W. Liberty Street
   │                   Suite 510

15 │                   Reno, Nevada 89501
   │                   cdenney@swlaw.com

16 │                   *Attorney for Mr. Bridges (local counsel)*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been served by Electronic Notification, on this 30th day of November 2015, on the following: all parties.

___/s/_____
Steven H. Levin
*Attorney for the Mr. Bridges*

23006800