1        Pages 1 - 79

2              UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF CALIFORNIA

4    Before the Honorable Richard Seeborg, Judge.

5    UNITED STATES OF AMERICA,    )   **APPEAL NO. 15-10590**
                                  )
6         Plaintiff,              )
                                  )   **CASE NO.**
7    v.                           )   **3:15-cr-00319-RS-1**
                                  )
8    SHAUN W. BRIDGES,            )
                                  )
9         Defendant.              )
     _____)

10
                                  San Francisco, California
11                                Monday, December 7, 2015
                                  11:00 A.M. Calendar
12

13              <u>**TRANSCRIPT OF PROCEEDINGS**</u>

14   <u>**APPEARANCES**</u>:

15   For Plaintiff United States of America:

16              **KATHRYN R. HAUN, AUSA**
                450 Golden Gate Ave
17              PO Box 36055
                San Francisco, CA 94102
18
                **RICHARD B EVANS, AUSA**
19              DOJ
                Criminal Division, Public Integrity Section
20              1400 New York Ave NW, 12th Floor
                Washington, DC 20005
21
     For Defendant Shaun W. Bridges:
22
                **CRAIG DENNEY, ESQ.**
23              Snell and Wilmer
                50 W. Liberty Street, Suite 510
24              Reno, NV 89501

25   **(APPEARANCES CONTINUED ON FOLLOWING PAGE:)**

1     **APPEARANCES (CONTINUED.)**

2

      For Defendant Shaun W. Bridges:
3
          **STEVEN HALE LEVIN, ESQ.**
4         Levin and Curlett LLC
          201 N. Charles Street, Suite 2000
5         Baltimore, MD 21201

6

7

8     Reported by Kelly Polvi, Contract Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MONDAY, DECEMBER 7, 2015                           11:04 A.M.

P R O C E E D I N G S

---oOo---

THE CLERK:  Calling case CR-15-319, United States versus
Shaun W. Bridges.

Counsel, please state your appearances.

MS. HAUN:  Good morning, Your Honor.  Kathryn Haun for
the United States.  I'm joined by my co-counsel, Richard Evans,
from the Department of Justice's Public Integrity Section.

MR. EVANS:  Good morning, Your Honor.

MR. LEVIN:  Good morning, Your Honor.  Steven Levin on
behalf of Mr. Bridges.

MR. DENNEY:  And Craig Denney on behalf of Mr. Bridges.

THE COURT:  Good morning.  This is the time set for
sentencing.

Has counsel had the opportunity to review the presentence
report?

MS. HAUN:  Yes, Your Honor.  I'd like to turn this
portion of the hearing to my colleague, Mr. Evans.

THE COURT:  Let me just get some preliminaries, and then
you can divvy it up however you would like to do it.

Have you had an opportunity to review the presentence
report?

MR. LEVIN:  Yes, Your Honor.

THE COURT:  And have you had an opportunity to discuss

1   that with your client, Mr. Bridges?

2        MR. LEVIN:  I have, Your Honor.

3        THE COURT:  All right.  Let me just make clear what I

4   have reviewed.  I've reviewed the presentence report; I've

5   reviewed the government's sentencing brief; I've reviewed the

6   defendant's sentencing brief, which attaches various

7   commendations received by Mr. Bridges during his law

8   enforcement career, as well as letters of support from former

9   Maryland Governor Ehrlich, Mr. Hutchins, who apparently is a

10  former superintendent of the Maryland state police, and

11  Mr. Lawman, a former Secret Service colleague of Mr. Bridges;

12  and then I've also reviewed the report that the defense has

13  submitted that was prepared by Dr. Bloomberg.

14       Okay.  Now, Ms. Haun, you wanted to tell me something?

15       MS. HAUN:  Your Honor, I just wanted to see how the Court

16  wanted to proceed today.  As the Court is aware, we have a

17  victim here who's flown out here to make a victim impact

18  statement.  That's Mr. Curtis Green.

19       So just wanted to kind of take the --

20       THE COURT:  Okay.  Well, I will -- we'll get there.  Let

21  me do a few things first, and then I'll tell you when would be

22  an appropriate time to hear from -- Mr. Curtis, you said?

23       MS. HAUN:  Mr. Curtis Green.  Mr. Green.

24       THE COURT:  Okay.

25       MS. HAUN:  And Mr. Evans is prepared to address a large

1    part of the arguments made in the government's sentencing

2    memorandum.  I also have a few points, Your Honor, to make

3    before the government submits the matter.

4        **THE COURT:**  That is fine.  And you can divide up your

5    discussion any way you want to divide it up.

6        **MS. HAUN:**  Thank you.

7        **THE COURT:**  Let me first focus on the presentence report.

8        Are there any factual objections beyond those that are

9    listed in the addendum to the report?

10       **MR. EVANS:**  Not from of the government, Your Honor.

11       **MR. LEVIN:**  No, Your Honor.

12       **THE COURT:**  Okay.  Let me just go through those.

13   Objections 1 through 4 pertain to various paragraphs in the

14   offense conduct section.  I've read the objections, I've read

15   the responses from the probation officer, and I'm satisfied

16   with the responses from the probation officer as to his bases

17   for including the information.

18       And I, therefore, will overrule those objections.

19       Objection No. 5 goes to the two-level upward adjustment

20   for sophisticated means to be 1.1(b)(10)(C).

21       Mr. Levin, I'll hear from you.  But I have to tell you, I

22   think it's fully warranted, and unless there's something in

23   addition you want to present, I think those two levels plainly

24   apply.

25       **MR. LEVIN:**  I think they do too, Your Honor, as a matter

1    of law, but -- and I don't want to waste the Court's time with

2    this.  But I do want to at least emphasize, which we've

3    addressed in the sentencing memo, the fact that, as a practical

4    matter -- perhaps not as a legal matter, but as a practical

5    matter -- this wasn't particularly sophisticated.

6        Mr. Bridges set up a Mt. Gox account in his name.  The

7    money was -- at the time Mr. Bridges set up that

8    Mt. Gox excha- -- account, there were ceiling limits put in

9    place so that the nine or so transactions that occurred in the

10    two months that followed from Mt. Gox to a fidelity account

11    were already set in place.  They were automatic.  So

12    Mr. Bridges engaged in the conduct.

13        At this point, however, this was passive conduct for

14    those two months.  And the money was transferred to another

15    account in Mr. Bridges's name, and then ultimately 200,000 --

16    or $250,000 was transferred to a bank account in his name and

17    that of his wife so that they could pay taxes.

18        That's really only -- the only point that I wanted to

19    make, that there weren't additional efforts to hide his

20    identity.

21        **THE COURT**:  I fear our definition of "sophisticated" is

22    quite different.  I think this is plainly sophisticated.  And

23    additionally, the two levels would apply because I do think

24    there's activities through the Japanese account.  Offshore, if

25    you will.  It's pretty clear to me that it's a -- to me, it's a

1    sophisticated scheme.

2         Okay.  Our starting point, as always, is the -- has to be

3    the advisory sentencing guidelines, which I find are correctly

4    calculated in the presentence report as a total offense level

5    of 25, a criminal history category of one, and that yields an

6    advisory guideline sentencing range of 57 to 71 months.

7         The government and the probation officer are recommending

8    a high-end sentence of 71 months; the defense is arguing for a

9    custodial sentence of not more than 36 months.

10        So that's where things stand.

11        Let me look to the government to begin the discussion.

12        **MR. EVANS:**  Thank you, Your Honor.

13        In addition to the guidelines calculation, I want to

14   point out the fact that, as indicated in the presentence

15   report -- which was not objected to by defense -- that there

16   is -- the probation office found that there is no basis for

17   departure in this case.

18        And we would agree with that, that there are no

19   identifiable grounds for departure.

20        And in defense's sentencing memo they've identified two,

21   pursuant to the sentencing guidelines.  Section 5(h)1.3,

22   regarding mental health, and 5(h)1.4, regarding alcohol abuse.

23   And I guess those are directed toward departures.

24        And as we've said, and as I think the presentencing

25   report points out, that there are no departures that are

1    appropriate here.  They're essentially asking for a downward

2    variance, which is something different.

3        And we -- and the government, Your Honor, contends that

4    there are no bases for a downward variance here either.

5        The thrust of defense's argument at this point is that

6    given the defendant's law enforcement career in -- whether it

7    was the county, then the State of Maryland and Secret

8    Service -- and the fact that he's a first offender, should

9    translate into a downward variance from the guideline range.

10       Your Honor, the government believes that neither of those

11   should merit any downward variance.  In fact, the first-time

12   offender role is taken into account by the guidelines, the fact

13   that he's category one instead of some other category.  To the

14   extent that that's even an issue.

15       So what we're left with, Your Honor, is the 3553(a)

16   factors to discuss in fashioning an appropriate sentence that's

17   appropriate in a case such as this.

18       And, Your Honor, I think that the Court -- and as we've

19   made plain in our sentencing memorandum -- has to focus on the

20   nature and circumstances of the offense here.

21       This was not just a pure theft.  This was not someone

22   stealing money from the till.  This was an agent, a federal law

23   enforcement agent, who was involved in a multi-agent --

24   multi-agency task force that had been ongoing for years who

25   decided to steal bitcoins, which he later converted to cash,

1      from essentially the target of the investigation, and lay the

2      blame for that theft on a cooperating witness.

3          This was not a mere theft, as defense counsel would like

4      this Court to believe.  And I know the defense pointed out

5      several cases which speak to that -- from courts outside of

6      this jurisdiction and outside the Ninth Circuit, which would

7      support the idea that, well, in theft -- for theft cases, the

8      guidelines are too high.

9          That's not the case in this particular situation,

10     Your Honor.  Although this was a theft, the crimes to which

11     defendant pled to were money laundering related to wire fraud

12     under 1957, and obstruction of justice under 1512.

13         So --

14     **THE COURT:**  The obstruction of justice charge, that is --

15     in part, goes to conduct once the law enforcement authorities

16     realized something was going on.

17         Just go over with me again.  I know I reviewed it in the

18     context of certainly the entry of the plea, but what is the

19     obstruction charge?  What's the essence of it?

20     **MR. EVANS:**  Your Honor, the Court is correct.  There are

21     basically two components of the obstruction conduct here.  The

22     one related to Mr. Bridges's obstruction of the Baltimore

23     investigation of trying to determine who Dread Pirate Roberts

24     was and obstructing that investigation by stealing the

25     bitcoins, by making that cooperator unavailable for future

1  cooperation.

2  Basically, they had to kill him off because of this

3  theft.  Which you'll hear more about that from the -- Mr. Green

4  himself.

5  So the obstruction of that investigation is one

6  component.

7  The obstruction on the second part is as to our

8  investigation of the criminal acts that were undertaken as part

9  of the task force related to Mr. Mark -- Carl -- Force -- which

10  he was sentenced back in October by this Court -- as well as by

11  Mr.  Bridges, where he lied to federal agents back in -- I

12  believe it was May of 2014; again, in November of 2014.

13  **THE COURT:**  The lie took the form, in Mr. Bridges's case,

14  of suggesting that Mr. Green was the one who actually had

15  stolen the bitcoin.

16  **MR. EVANS:**  Actually, that, Your Honor, was as to the

17  first component.  I think basically when the theft came -- when

18  the theft occurred, everyone focused on Mr. Green because it

19  was done with his own --

20  **THE COURT:**  His access.

21  **MR. EVANS:**  His access.  And no one on the task force

22  wanted to believe it was anyone else on the task force who had

23  done that, so they all focused on Mr. Green.  And, in fact,

24  they said, "You're trying to be a cooperator, yet you're

25  stealing bitcoins.  You're not even going to get the benefit of

1    that cooperation."

2         So that obstructive conduct related to the theft of the

3    bitcoins.

4         The other obstruction came as to this grand jury

5    operating out of San Francisco, who was investigating

6    corruption by the task force agents.  In fact, Mr. Bridges was

7    interviewed by agents in Baltimore -- I believe it was in May

8    of 2014.  Then in Washington, D.C., about six months later --

9    in November of 2014, was questioned about various aspects of

10   the Force conduct, as well as possibly his own, and lied to

11   federal agents during those interviews.

12        He also lied to federal agents subsequently, in March of

13   2015, just prior to pleading guilty regarding the -- his

14   interactions with another Secret Service employee who had done

15   FinCEN searches for him to figure out whether or not any SARS

16   had been issued with his name and as a result of the transfers

17   of funds to Fidelity, and basically met with her before and

18   after her testimony -- her interviews with agents, and her

19   testimony to the grand jury, about telling a false consistent

20   story.

21        So there was obstruction of the Baltimore grand jury

22   investigating the Silk Road, and obstruction of the

23   San Francisco grand jury investigation investigating the agents

24   who we believe were corrupt at the time.

25        **THE COURT:**  Well, my understanding is that while they

1    interact at a certain point, Mr. Force and Mr. Bridges are

2    engaged in, if you will, separate conduct in terms of the money

3    laundering and the theft activity.

4        MR. EVANS:  That appears to be the case, Your Honor.

5        THE COURT:  They're not doing that in conjunction or in

6    league with each other in any way.

7        MR. EVANS:  We've not revealed any evidence that would

8    indicate that.  You know, in a small task force, when you've

9    got corrupt agents, one would think they would possibly talk

10   about that.  But we've not recovered any evidence to suggest

11   that.  And all we've got at this point is indications that they

12   were operating in separate silos, doing it on their own.

13       THE COURT:  But then they do come together with respect

14   to Mr. Green and that whole business.

15       MR. EVANS:  They are, Your Honor.  They were both

16   involved in the arrest of Mr. Green and his debrief.

17       Now, Mr. Bridges left that next day and did not attend

18   the second day of the debrief, but that was after he had stolen

19   the bitcoins.  I think he probably wanted to get out of there

20   and didn't want to be a part of it.

21       But yes, Your Honor, as far as the government knows at

22   this point, the evidence is they were operating independently.

23       THE COURT:  Okay.

24       MR. EVANS:  Now, Your Honor, as we indicated in our

25   pleadings as well, that this was not a -- this was not a single

act. There was a theft that happened in one instance, or over a certain period of time when he withdrew bitcoins from various accounts. But that was not the only part of his crime here, Your Honor. He then had to transfer those funds internationally to Japan, to Mt. Gox, and then, over time, transfer those, convert those to funds, and transfer them back into his Fidelity account.

THE COURT: There is a suggestion he does pay taxes on all that.

MR. EVANS: He apparently did pay taxes on it. I don't know if he was trying to, you know, make it so it's legitimate, that if anyone looked at that they'd say, "Oh, he made money in investing in bitcoins." He was known to be an investor and he had invested in bitcoins on his own. Maybe that was an attempt to further legitimize this to say, "Hey, if someone looks at my accounts they'll see I paid taxes on it."

But the defendant had an opportunity many times along the way to come in and to come clean and he didn't. When he was interviewed in early May, when the problems with Carl Force happened prior to that, when he was interviewed in November of 2014, and then later in the spring. It was not until he was told that charges were imminent that he came in and took responsibility and pled guilty.

And even at that point, Your Honor, there were -- you know, there were falsehoods that the defendant made to agents

1    investigating the corruption.

2        And the Court is aware of various other things along the

3    way in terms of post-plea agreement conduct, in terms of

4    attempts to change names and Social Security numbers.  All

5    these things have led to more and more restrictive

6    presentencing release conditions.  In fact, the Court released

7    him on rather restrictive conditions last fall after his --

8    after his plea.

9        We subsequently had another run-in with Mr. Bridges back

10   in Baltimore in which the Court added further to the release

11   conditions, basically confining him to his house under

12   electronic monitoring.

13   THE COURT:  I'm not sure what we do with that, though.

14   Because to some extent that's addressed by the additional

15   restrictions.  I mean, those -- what conduct on pretrial is, to

16   some extent, I think cabined by that period of time and we

17   address it, as we are required to do, and could lead up to

18   custody pending sentencing.

19       But I'm not sure it's an independent -- this is a

20   question, not a statement:  Is it an independent sentencing

21   factor to take into consideration or is it something that in

22   the moment needs to be dealt with in terms of what the release

23   conditions are.

24   MR. EVANS:  Your Honor, it's not necessarily a

25   independent factor; it's just a pattern of the conduct that I

1   wanted to bring to the Court's attention here.

2       This is not a case where the defendant, as laid out in

3   his pleadings, basically says when he was confronted he took

4   responsibility and there has tried to make it right since then.

5       There have been additional things.  Whether it's the

6   weapons, where he volunteered to turn over his weapons to

7   authorities that he owned -- which he did -- but then

8   subsequently his wife turned out -- presented the government

9   with a bill of sale from her attorney who claimed to have

10  bought them from her husband the day he was out here, for a

11  dollar, and that they now belong to her.

12      And then only when we raised issues about the legality of

13  such a sale of the type of weapons involved, did the request

14  for those to be returned to his wife, as opposed to him, kind

15  of go away.

16      There's just a series of things here, Your Honor, which

17  cause the government concern about his overall truthfulness and

18  so forth.

19      **THE COURT:**  Some of those issues might be addressed in

20  terms of the self-surrender issues.

21      **MR. EVANS:**  Well, that's just it, Your Honor.  That's one

22  of the things the government was going to be asking for today.

23      And just wanted to point out that this is not an instance

24  where he stole something once, when confronted, he confessed,

25  and that was it.  There's been a pattern of deception here

1    that's gone on for years.  And it's not just a matter of weeks

2    or months, Your Honor.

3    Your Honor, this is one of those cases, as well, that --

4    many of the cases that we deal with in public corruption,

5    specific deterrence is not necessarily an issue.  The

6    individual former contracting officer, or something like that,

7    they're not going to be in that position again.

8    The specific deterrence issue is not as big of a factor;

9    it's more general deterrence.

10    This, Your Honor, is a case we believe that both specific

11    deterrence and general deterrence are important factors.

12    As I indicated just previously, there's a pattern of

13    conduct here with the defendant that we find troubling and is

14    one of reasons we're going to be asking the Court to remand the

15    defendant into custody after sentencing this morning.

16    But Mr. Bridges was involved in numerous investigations,

17    in numerous seizures of bitcoins, of other digital currency,

18    which, Your Honor, we have no -- in some of these cases, have

19    no indication of where those currencies have gone, the extent

20    of those seized, and so forth.  There are a lot of unanswered

21    questions.

22    And one of the reasons why his --

23    **THE COURT:**  Your suggestion is that -- I'm not sure I

24    follow you -- that -- is that simply because the government

25    isn't in a position to have a handle on what some of the

conduct -- their own agent's conduct has been?  I mean, I'm certainly not going to take the assumption that there's all sorts of purloined funds out there floating around and Mr. Bridges may someday have access to it, if that's what you're suggesting.

MR. EVANS:  Your Honor, my point is only that -- as part of the release conditions that Mr. Bridges is currently under, is he can't even access -- he's not permitted to access computers at this point in time.  And that's for a variety of reasons.

But the point here is, Your Honor, this individual has expertise in digital currency, in dark websites, and has had access to these types of cases and has been involved in seizures.

And that's one of the issues that my colleague will address.

But the impacts of his conduct go well beyond this case and affect many other cases.

And the specific deterrence component is still here with Mr. Bridges, I believe, as well as the general deterrence.

Other law enforcement, other government officials, have to know that if you undergo, or if you undertake this type of conduct, that if you steal from the targets of your investigation to line your own pockets, there's severe penalties that you'll be facing, so that, in addition to the

1    specific deterrents as to Mr. Bridges -- I know defense counsel

2    says that he's learned his lesson, he's not going to be back

3    before any Court -- I don't feel fully confident of that,

4    Your Honor.  In fact, I think it's a concern the Court should

5    take into consideration, as well as the general deterrence

6    factor.

7          Now, in terms of the downward variance -- my colleague

8    will address the Court on the issue of the mental health.

9          But, Your Honor, I just want to say about the alcohol

10   abuse that's raised.  This is not -- as the guidelines discuss,

11   this is not ordinarily a reason for a downward departure.

12         Again, we're talking departures under 5(h)1.4.

13         To the extent that Mr. Bridges needs alcohol treatment,

14   the Bureau of Prisons is well equipped to provide that type of

15   treatment throughout his incarceration.

16         And my colleague will address the mental health issues at

17   this point, a couple of other items that the Court should be

18   aware of.

19         **THE COURT**:  Okay, Ms. Haun.

20         **MS. HAUN**:  Thank you, Your Honor.  I wanted to mention

21   three things and three reasons why I really believe that the

22   Court should impose a high-end sentence here.

23         The first is just the breathtaking abuse of trust that

24   the government and that the public has suffered at the hands of

25   Mr. Bridges.

1          One thing I've been clear to report to the Court --

2     Mr. Bridges and his lawyer already know this, of course -- but

3     I'm authorized to share with the Court that as a member of the

4     Secret Service Mr. Bridges served a joint-duty assignment with

5     the National Security Agency, Your Honor, during the time frame

6     of these events that led to this case.

7          So I'm not sure if Your Honor was aware of Mr. --

8          **THE COURT**:  I think it's actually in the presentence

9     report.

10          **MS. HAUN**:  Okay.  Well, Your Honor --

11          **THE COURT**:  Or it was, perhaps, in the sentencing

12     memoranda.  But I was alerted to that.

13          **MS. HAUN**:  Okay.  So as part of this joint-duty

14     assignment with the NSA of course Mr. Bridges had to fill out a

15     routine background check, and part of those questions ask if

16     there's any mental health issue.  And the queries were always

17     responded to negatively.

18          In addition, Mr. Bridges, as part of Secret Service, was

19     charged with guarding members of the First Family.  Again,

20     during the time frame here in this case.  In fact, one of the

21     items of discovery that was provided to defense counsel in this

22     case was a series of text messages in which Mr. Bridges engaged

23     with another member of Baltimore Silk Task Force, an IRS agent,

24     and the two of them were routinely talking about their trading,

25     how much money they were making in the market.

1   This is unclear if it was with the proceeds of the crimes

2   in this case.

3   While all the way Mr. Bridges, throughout this text

4   messages, is telling this other IRS agent "Hey, I'm guarding

5   Mrs. Obama right now."  While he's making these trades.

6   So I think aside from the fact that there's no indication

7   until now, until the prosecution of this case, that Mr. Bridges

8   has some mental defect, there's no -- there's never been a

9   suggestion throughout Mr. Bridges's somewhat lengthy career

10  with the Secret Service -- and certainly with law

11  enforcement -- that he was suffering from a mental defect.

12  So I think any kind of departure, for those reasons, is

13  inappropriate.  For the same reasons were in inappropriate in

14  the case of Mr. Force.  Who at least, in the case of Mr. Force,

15  had some suggestion of mental health issues during the time

16  frame of the events in question of his case.

17  The reason I raise the NSA and guarding the First Family

18  is, again, this is an agent with the Secret Service, a federal

19  agent.  And the way he abused the public trust, it cannot be

20  said that it was a simple one-off theft.

21  And by the way, even if it was a one-off theft, a one-off

22  theft by a member of a federal task force is one too many.

23  Which brings me to my second reason, Your Honor, that I

24  think that a high-end sentence is merited here.

25  The number of cases that Mr. Bridges contaminated, not

1    just existing criminal cases, but also investigations across

2    the country that his conduct has led to have to be shut down,

3    is truly staggering.

4         We start here -- there was a criminal investigation that

5    another district had into Mt. Gox that's had to since be shut

6    down.

7         **THE COURT:**  And your position is the shutting down of

8    those is entirely ascribable to the conduct of Mr. Bridges?

9         **MS. HAUN:**  I won't make representation it's 100 percent,

10   Your Honor.  Because of course it was in early stages of

11   investigation; I don't know whether other factors would have

12   ended up shutting it down as well.

13        But I can tell you that Mr. Bridges learned that there is

14   a criminal investigation afoot with respect to Mt. Gox.  And

15   what did he do?  He turned around with an AUSA in the Baltimore

16   office and did a civil seizure warrant of accounts belonging to

17   Mr. Karpeles, who was, at that time, the head of Mt. Gox.

18        But before he did that, two days before he did that, he

19   made sure to get all of his own money out.

20        The government's theory is that one of the reasons he did

21   this seizure warrant, Your Honor, is because he didn't want a

22   criminal case to proceed because if the US government ever got

23   Mt. Gox records they might see his own name on them.

24        But that's just one example.  I can tell you from my own

25   knowledge that in this district a number of investigations have

1     had to be shut down directly -- directly, a hundred percent,

2     because of Mr. Bridges.  And that's because in his role as a

3     digital currency expert he would fly across the country and

4     consult in different jurisdictions out on the West Coast, up in

5     Oregon, back on the East Coast.  He flew all over offering his

6     help and advice to other Secret Service agents and other

7     federal agents.

8         As a result of his name now being on those

9     investigations, they have had to be shut down.  So I think

10     that's another factor.

11         Again, even if it's one theft, it's one theft too many.

12         And the third reason, Your Honor, is because of the way

13     that Mr. Bridges set Mr. Curtis Green up entirely to take the

14     fall.

15         And you'll hear today from Mr. Green himself.  But one of

16     the things Mr. Green is going to tell you is how Bridges,

17     himself, was so intent, during the proffer -- now, of course

18     Green -- Mr. Green, was flipped.  He was going to cooperate

19     with the government.  So here he's sitting in a room of federal

20     agents, who he thinks he can trust.  He's made the early

21     determination he's going to come clean and he wants to

22     cooperate with the government.

23         And he'll tell you about how Mr. Bridges was so insistent

24     on learning exactly how to log into to his -- using his

25     administrative account and passwords, and he'll tell you, also,

that Mr. Bridges didn't just simply transfer approximately 21,000 bitcoins out to steal them, he transferred them to Curtis Green's account.  And the reason why, Your Honor, is because he wanted to have a suspect.  He wanted DPR, who's now -- we know is Russ Ulbricht, he wanted other Silk Road vendors and users to know, "Here's the person who stole my 1,000 bitcoins.  It's Curtis Green."

Curtis Green is going to tell you about the over 30 death threats he had.  He's going to describe to you firsthand how he was housebound for a year, Your Honor, and how he's been in fear for his life.  Because of course Russ Ulbricht put out two hit teams.  And one of the hit teams turned out to be the Federal Baltimore Agent Task Force, but another one of those hit teams, Mr. Green will tell you about, and he'll also tell you about how he was threatened and told he would not be getting a 5K a sentencing reduction because the prosecutor and the other agents felt he was lying because certainly his own credentials had been used to move 21,000 bitcoins.

And I think, together with the reasons that my colleague, Mr. Evans, addressed, Your Honor, this case undoubtably merits a high-end sentence.

And on that I would submit.

**THE COURT:**  Thank you.

I will hear from Mr. Green at this point, and then turn to the defense.

1    Mr. Green, if you could come forward.  Come forward to

2 the podium, sir.

3    For the record, if you could give us your name.

4    **MR. GREEN:**  Curtis Green.

5    **THE COURT:**  Very well.

6    **MR. GREEN:**  Is it okay if I have Ms. Haun stand next to

7 me?

8    **THE COURT:**  Oh, sure.  Sure.

9    **MR. GREEN:**  You'll have to excuse me.  I get nervous, and

10 I just want to have her so she can keep me on the path.

11    **THE COURT:**  I recognize it's an intimidating place.

12    **MR. GREEN:**  Very much so.

13    **MS. HAUN:**  And Your Honor, just for the record, Mr. Green

14 is represented by criminal counsel in this case out in

15 Salt Lake City, Utah, and both of them were unable to travel

16 here today but asked that Mr. Green come and speak for himself.

17    **THE COURT:**  Very well.

18    So you may proceed, Mr. Green.

19    **MR. GREEN:**  Okay.  I guess I'll start back with the

20 proffer arrangement I had.  It was actually located in the

21 Secret Service building with -- oh, approximately -- I couldn't

22 tell you, 15, 20 -- what I was told was pretty much the entire

23 Baltimore Silk Road Task Force.

24    And they obviously offered me a proffer agreement with an

25 attached -- I don't want to get too much -- 5K, I'll leave it

at that.

And during the -- during the proffer agreement they started out asking standard questions.  You know, how did I get involved, you know, just the basic, you know, things.

And one of the things that --

**THE COURT:**  Which agents were there when they were talking to you?

**MR. GREEN:**  There was --

**THE COURT:**  Was Mr. Bridges?

**MR. GREEN:**  Oh, absolutely.  He sat, I believe, right across -- in fact, where this lady is sitting.  Almost the exact same distance.

I lost my train of thought again.

And so they offered -- in the proffer agreement they told me that, you know, as long as I told the truth and 100 percent the truth, nothing could be held against me.  So obviously I made sure that I told 100 percent the truth.  Every question that they asked, I answered 100-percent truthful.  I mean, as far as I knew it, obviously.

Anyway, after getting -- and we started, and we got to the, you know, how to log in.  I showed them how to log in.

And the agents were just taking notes and asking simple questions.  Mr. Bridges kept on asking me how to get in and asking me specifics on how to -- "How do you change that password?"  And I actually turned my computer towards him to

1   actually show him, since he was -- to show him exactly how to

2   do it.  And I think I showed him more than once.  And, in fact,

3   later on, right before he left to go move the bitcoins, he

4   asked me to show him one more time, and -- just to make sure

5   that he knew exact- -- because it was fairly com- -- you know,

6   fairly complicated.

7         He set me up to take the fall.  And what that did was

8   he -- he wanted DPR Russ Ulbricht to make sure that it was me

9   that did it.  And he knew that -- DPR knew who exactly who I

10  was.  And DPR Russ Ulbricht had, obviously, millions -- if not

11  hundreds of millions -- of dollars at his disposal.  Which, you

12  know, when you're dealing with a criminal, you know, you could

13  definitely put, you know, my life in danger.

14        And he also purposely put -- when he moved the bitcoins

15  he moved them into my account so it really looked like I did

16  it.  I mean, anybody looking into it would -- it would be a

17  no-brainer, saying, "Oh, obviously he did it."

18        And so he was very calculated.  It was very well thought

19  out, in my opinion.

20        And also, you know, I can't tell you how many -- how many

21  death threats I've received.  More than 30, and probably less

22  than 200.  One -- one death threat specifically told what they

23  would do to my grandchildren in very -- in great detail.  It

24  was very specific.  Which you -- I didn't want to ever repeat

25  it.

1      Fortunately, I only got one of those terrible -- I mean,

2 obviously all of them were bad.  He named my grandchild with

3 their full names, middle names, addresses.

4      And so you can imagine the mental stress and anguish that

5 it put me through.

6      Not only that, I was essentially, basically -- I guess

7 you would call it -- self-imposed house arrest.

8      Carl Force was one of the guys that Russ Ulbricht

9 happened to hire to kill me.

10      And then we faked my death, took photos and -- very

11 realistic, and sent them in.

12      And there was also a -- there was actually a second group

13 that was -- that was hired to kill me.  So I actually had -- I

14 had two, two different groups that were supposed to kill me and

15 my family.  And I didn't even know about the second group until

16 recently.

17      I'm so fortunate that so far nothing has happened.  You

18 know, they could kill me, but they still want to hurt my

19 family.  And like I said, I was -- I was house-bound for a

20 year, almost a year.  Ten, eleven months, I believe.  I didn't

21 leave -- it was about a 30-foot radius to my kitchen and I had

22 a bathroom in my room.  I had to have all my -- my blinds

23 drawn.

24      And Carl Force called me on a daily basis to make sure

25 that I was keeping low, not going out.

1      And I also -- and the one thing -- I don't even know if

2 Ms. Haun knows, but Carl, one day, called me and he said,

3 "You'll be -- you'll be receiving a call from Shaun Bridges.

4 Tell him whatever he needs to know."

5      And I'm, like, sure.  I'm helping, you know.  These are

6 the good guys.  They're there to protect me, which I thought.

7      And, obviously, I was just totally wrong.

8      And he did call me and we -- he talked about bitcoin and

9 I educated him.  I'm -- unfortunately, I wish I would have

10 never got involved in bitcoin, to be honest with you.  But I

11 educated -- you know, thinking I was helping the government I

12 educated Mr. Bridges and Carl Force on how bitcoin worked, how

13 to move bitcoin, how to essentially hide it.

14      And that's the one thing that I -- knowing bitcoin as

15 well as I do, I mean, I would consider myself an expert in

16 bitcoin because I've been there since the beginning, bitcoin is

17 extremely easy to hide.  I could have a billion dollars in

18 my -- on a thumb drive in my pocket right now and, you know,

19 unless you put it in there and on a computer, you know --

20      So when I heard them saying that, is there other money,

21 the bitcoins, you know, I can't speculate, I don't want to

22 speculate.  But I just -- to let you know, it is extremely,

23 extremely easy to hide.

24      Okay.  And the other thing that I was, you know, I would

25 say I was given a 5K.  And when they thought that I -- when

they discovered that all the bitcoins had been moved I was immediately accused. Immediately. The attorney general screaming at me -- the AUSA. Yeah. I'm sorry. To me, they're all the same.

The AUSA would -- "Come on. You -- we know you stole it. We know you did it." And then another agent would pull me to the side and say, "Come on. They're the bad guys," you know.

And I kept on saying, "I -- I wish I could, you know." And I kept on saying, "It doesn't make sense for me to steal the money, the bitcoins. If I was that type of person, why would I steal it the night that I am in front of 15 agents? I -- wouldn't I have done it the week before in the comfort of my home?"

It just made no common sense to me whatsoever, and I couldn't believe that they were accusing me. It blew my mind, just because there was -- anyway.

Okay. Yeah. And they were, like, they were going to take my 5K away from me. Herring -- Herring said -- said, "We are going to take -- you know, we don't think you're telling the truth and, since you lied to us, we're going to take that away." And that blew me away.

And I begged them for a lie detector test.

And Bridges -- not Bridges, Force, kiboshed, every time, that.

But yeah, that was -- the 5K reduction was -- until they

1       found the real culprit, that 5K was taken off the table.

2           And finally I was vindicated and proved that I did not

3       steal that money because that money turned -- I think by the

4       time they turned it in it was close to a million dollars

5       instead of at the time it was 300,000, I believe.  Now it

6       turned into a million.

7           So anyway -- I think -- oh, one more thing I want to say.

8       You know, Mr. Bridges, being a federal agent, I believe, needs

9       to be held to a higher standard.  His crime definitely was not

10      victimless.  I am trying -- I am still trying to deal with the

11      emotional and physical pain that it has caused me.  I've lost

12      and gained 120 pounds two times since this has all happened.  I

13      have been diagnosed with post-traumatic stress disorder and am

14      seeing a psychologist for that.  And now that they -- just

15      ironically, the other guy that was kind of helping them kill me

16      was just arrested three days ago, which his name was Variety

17      Jones.  That's his pseudonym.  Thomas Clark, I believe, is his

18      real name.  And that kind of gives me a little comfort knowing

19      that he's now in custody because he was the other person that

20      really wanted me dead and who was helping, you know.  And I

21      just hope that, you know, I can now get my life back into

22      order.

23          And, like I said, this is definitely not a victimless

24      crime and what I went through was literally, literal, hell.

25          And thank you.

1      **THE COURT:** Thank you, Mr. Green. Thank you for coming

2  forward.

3      Mr. Levin.

4      **MR. LEVIN:** Thank you, Your Honor. We have two people

5  who have flown here from Maryland that would like to briefly

6  address the Court.

7      **THE COURT:** Well, generally I don't have people

8  addressing the Court, other than counsel and the defendant.

9  Who are these people?

10      **MR. LEVIN:** One is a former supervisor.

11      **THE COURT:** That's why you submit material to me in

12  advance. I don't generally have hearings where people come and

13  provide character evidence orally.

14      **MR. LEVIN:** This was referenced in one of the filings

15  that we submitted to the Court that we indicated Ms. Barbara

16  Golden would be testifying. There was no objection to that by

17  Counsel.

18      **THE COURT:** Well, it's not how I generally proceed. And

19  I was not -- I don't recall where you told me that.

20      **MR. LEVIN:** It was filed in a court hearing where there

21  was some suggestion that Mr. Bridges was reporting a theft of

22  his wallet and backpack and we indicated, part of our argument,

23  that of course he was going to be here for sentencing because

24  he had made arrangements for Ms. Barbara Golden to speak on his

25  behalf.

1    **THE COURT:** So that's buried in something. It's not in

2  your sentencing memorandum. That's what I'm looking at when

3  I'm preparing for this hearing. So to expect me -- this is

4  some prior pleading somewhere that I'm supposed to go back and

5  find? You're making a passing reference to this?

6    I mean, you need to tell me in advance what your plan is.

7  Because, quite frankly, that's not how I generally proceed.

8    Now, I will allow you to call -- very brief -- allow

9  people to come up -- hopefully it's a controlled number.

10    How many people are you proposing to bring up? Here.

11    **MR. LEVIN:** We have Ms. Golden and Mr. Bridges's wife,

12  who has a very short statement.

13    **THE COURT:** Well, again, I get this material in written

14  form and I spend a great deal of time with it and I review it.

15  But our sentencing in this district doesn't usually involve

16  character witnesses orally providing input.

17    **MR. LEVIN:** I understand that. And I do apologize. I

18  hope the Court will not hold that against Mr. Bridges.

19    **THE COURT:** I'm not going to hold it -- certainly not.

20  But I'm not pleased that this is how you're proposing to

21  proceed at this point.

22    But go ahead.

23    **MS. HAUN:** Your Honor, we don't have a problem with

24  Ms. Golden, although we've had no notice of this either.

25    However, with respect Ms. Esposito, who became

Mr. Bridges's wife during the pendency of this case, we have some concerns, particularly as it concerns the grand jury process and some privileges she's invoked before, as well as we have some background that we could then provide.

THE COURT: Well, that's why I'm -- this is not a trial proceeding where witnesses are -- credibility is being impeached. That's why we don't do it this way.

MS. HAUN: Right.

THE COURT: However, I assume that the statements -- any statements that are going to be made are going to be very limited to sentencing factors and not going into anything that perhaps would be of concern, if I understand your point.

MS. HAUN: Well, I think, Your Honor, then the Court should be aware that one week Ms. Esposito was subpoenaed to the grand jury she was not Mr. Bridges's wife; they had been together for approximately three years, as the government understands it. She asked for a week reprieve because of a scheduling issue. She asked the government and the agents if the grand jury could accommodate her one week later. We did so. In the intervening weekend, she married Mr. Bridges and then invoked spousal immunity.

I think whatever comments Ms. Esposito shares with the Court, the Court should have that background in mind.

THE COURT: Very well.

MR. LEVIN: She actually did not invoke marital privilege

1    initially.  She was willing to fly out here twice, and she did

2    fly out here twice, Your Honor, and spoke to the agents.  Only

3    when they threatened to prosecute her and call her before the

4    grand jury -- because they simply didn't believe her -- that's

5    when, on advice of her counsel, she invoked marital privilege.

6        **THE COURT:**  This is not Ms. Esposito's case, this is

7    Mr. Bridges's.  So I want the focus to be on the sentencing

8    factors pertaining to him.  This is one of the reasons, again,

9    that if this had been presented in an appropriate fashion

10   perhaps these issues could have been fleshed out.

11       But let's proceed.

12       **MR. LEVIN:**  Thank you, Your Honor.

13       **THE COURT:**  Are you proposing to have these people talk

14   to me before you present your discussion?

15       **MR. LEVIN:**  Yes, Your Honor, if that's okay with the

16   Court.

17       **THE COURT:**  All right.  Go ahead.

18       **MR. LEVIN:**  Thank you.

19       Ms. Barbara Golden.

20       **MS. GOLDEN:**  Thank you, Your Honor.

21       **THE COURT:**  Good morning.  If you could give us your

22   name?

23       **MS. GOLDEN:**  Barbara Golden.

24       **MR. EVANS:**  Your Honor, just inquiring whether the

25   witnesses are going to be placed under oath.

**THE COURT:**  No.  That's -- no, I would be receiving this in the letter form, which is how I would have preferred it.  So that's how I am going to be receiving it.

Go ahead.

**MS. GOLDEN:**  Thank you.

Your Honor, I've spent my entire adult life in the law enforcement community, specifically a 37-year career with the U.S. Secret Service.  I rose through the ranks and was privileged to be selected as the special agent in charge of the Baltimore field office.

When I reported to this position in 2007, the office was understaffed and overworked, with both investigative and protective assignments.

Then-President Bush spent almost every weekend at Camp David; then-Vice President Cheney spent weekends at a home in St. Michaels, Maryland, both of which required significant manpower.  I was able to justify to our headquarters the need to increase the staffing in the Baltimore office.  Some of these additions were agents transferring from protective assignments in Washington, D.C., but a majority were new hires applying for a special agent position.

As the special agent in charge, I had a great amount of say in who would either be assigned or hired in Baltimore.  I was very involved in the hiring process and conducted both one-on-one initial interviews and three-member panel

interviews.  The latter was the occasion in which I met Shaun

Bridges in 2009.

This involves three agents asking the applicant 20

pre-selected questions; some being situational scenarios,

others straightforward.

I recall Shaun first describing his career with the

Maryland State Police.  He was a decorated trooper, a member of

the Fugitive Task Force, and an instructor at the state police

academy.  His desire was to further his career in law

enforcement and to become a federal agent.  We then spent the

next hour conducting the panel interview.

Shaun never hesitated in his answers, he was confident

but never cocky, he brought to the table past experiences as a

trooper, which helped form his answers to the questions

presented, and he was very engaged with all three agents under

the stressful situation.  He struck me as a loyal and caring

law enforcement professional.

Several months following the panel interview Shaun was

approved for the special agent position he had applied for.  I

was instructed to offer Shaun a position in one of four cities:

New York, Jacksonville, St. Louis, or Cleveland.  Although

excited for this opportunity, Shaun explained he would suffer a

significant loss on a sale of his current residence.  I took

that argument to our headquarters, cited the current workload

the office was experiencing and the fact that I was very

impressed with Shaun and wanted him on my team.  I was able to

have Shaun assigned to the Baltimore field office.

Shaun immediately went through the extended training

requirements, both at the federal law enforcement training

center in Glenco, Georgia, for approximately 12 weeks, and the

Secret Service rally training in Laurel, Maryland, for another

16 weeks.  There Shaun excelled and was named first in his

class of 24 trainees in the academic category, which I

witnessed at his graduation.

Again, I was very impressed with Shaun.

Shortly after graduation I had had occasion to speak with

the commandant of the Maryland State Police, Colonel Terry

Sheridan.  Inside I was gloating that I had hired one of his

decorated troopers.  Shaun was ranked number one overall in his

trooper class.  Colonel Sheridan acknowledged his loss and

instantly knew and recited Shaun's accomplishments with MSP.

I believe this sparked a thought in Colonel Sheridan that

he had also lost an instructor at this academy.  Colonel

Sheridan soon launched an effort to borrow Shaun to continue to

teach criminal law at their MSP Academy.  I received a letter

from the commander of the MSP Academy requesting Shaun be

allowed to continue instructing.  To continue my professional

partnership and liaison with the Maryland State Police, that

request was granted.  And this only added to my confidence in

Shaun.

Over the course of Shaun's career with the Secret Service he taught approximately ten Maryland State Police Academy classes totaling approximately 500 troopers.  Not once did this interfere with the demands placed on him by the service.  And he continued to meet and balance every protective and investigative assignment with enthusiasm.

During this juggle of assignments and shortly after Shaun began his Secret Service career, he went through a divorce, which was emotionally devastating.  Shaun volunteered for protection assignments in an effort to keep busy.  He worked his cases diligently and never complained.

Shaun is an emotional person, and at times it was evident that this divorce deeply hurt him.  But he never made this an excuse to avoid his responsibilities; he met each and every one.

In early 2011 Shaun expressed an interest in and attended the Secret Service Electronic Crimes Special Agent Program, which trains agents in computer forensics and electronic crimes investigations.  Shaun easily excelled in this field.  Shaun also made the most significant seizures in the Baltimore office.  He was the only special agent to work counterfeit coin cases and made three large seizures from China totalling several thousand dollars, which no one, to my recollection, had ever done.

Shaun began working on the Silk Road investigation as an

offshoot of the counterfeit coin investigation, which now involved virtual currency known as "bitcoins." Because of his grasp on the concept of virtual currency, Shaun was asked by the FBI to sit on their virtual currency working group at the FBI headquarters. Shaun's first-line supervisor approved the request and Shaun attended monthly meetings, offering advice and sharing intelligence.

Another request for Shaun's assistance came from the Department of Justice's Asset Forfeiture Money Laundering section in Washington DC. Shaun was to represent the Secret Service on this committee to provide guidance on seizures relating to virtual currency.

This was, again, approved by Shaun's first-line supervisor with my blessing but it was rescinded by our own headquarters after just a few meetings. It is my belief that a supervisor above me did not feel it appropriate for a GS-13 to sit on a panel of this caliber, yet no substitute of a higher grade was made that I'm aware of.

Shaun's expertise continued to be sought after by the FBI and he accompanied a Baltimore supervisor, along with Secret Service Deputy Assistance Directors, to the FBI headquarters to brief FBI Assistant Director Demarest on the current status of virtual currency.

This meeting occurred following my departure from the Baltimore office, but I can attest to the multiple seizures

Shaun made involving virtual currency. These seizures totaled several million dollars, which made the GS-15 Baltimore field office number one service-wide.

With regard to comments made by the government in their sentencing memo about Shaun leaving one of his computers in a wipe area in our computer lab, I can attest that no Secret Service-issued equipment is ever randomly or deliberately wiped clean by an agent or a police officer that is assigned to that lab. Work stations are barely delineated due to the size of the lab itself. Overhead cabinets are utilized for storage of forensic equipment -- cables, disks, et cetera -- which Shaun obviously knew, having been assigned to the lab since 2011. Evidence that is to be examined by a trained forensic technician must be accompanied by a request from an agent or an agency with instructions as to what type of evidence they're seeking, whether it be credit card numbers, distinct trafficking in credit card numbers, child pornography, or whatever type of case is being investigated. Hard drives from suspect computers are labeled as evidence and maintained as such in a locked vault, as is the computer lab.

To my knowledge, there was a small area that was not someone's work space where hard drives or computers were set aside and were labeled or marked in some way indicating they were ready to be wiped. Approval to do so came from either a prosecutor at the end of all judicial action or a supervisor

before any suspected equipment was returned in a nonjudicial
investigation.

No one without instruction just randomly wiped computers
in the computer lab, as there is a priority to ensure that no
one did -- that no one did wipe a computer by accident, for
obvious reasons.  A Secret Service computer bearing a Secret
Service property number would never be wiped in the lab by
either a special agent or an officer assigned to that lab.

Since the computer that Shaun placed in the computer lab
was utilized by him for his computer forensic investigations,
it was the most logical decision, to place it in that lab.
Other agents would recognize the equipment as Secret Service
property and know that its purpose was for computer forensic
investigations.

Prior to his retirement from law enforcement, Shaun did
an extraordinary job as a Secret Service agent and I was proud
to have him on my team and on my side.  He has been through
hell past year, but I know he is at least, in part, relieved to
be able to start the rehabilitation process.  I pray he's given
a chance to prove himself once again.

THE COURT:  Thank you.

Mr. Levin.

MR. LEVIN:  Thank you, Your Honor.  If it's okay with the
Court, Ms. Esposito has a much more brief statement.

THE COURT:  Very well.

1    MR. LEVIN:  Thank you.

2    THE COURT:  Good morning, and if you could give us your

3  name.

4    MS. ESPOSITO:  All right.  Arianna Esposito.  I would

5  like to thank this Honorable Court for giving me the

6  opportunity to speak on my husband's behalf.  I acknowledge

7  that Your Honor has heard from countless mothers, fathers,

8  spouses, and children of the defendant, pleading for mercy for

9  their loved one, and, as such, what I have to say may not seem

10  different in the Court's eyes.  However, all I have the

11  capability of offering before you today is to share with you

12  the truth about my husband.

13    The truth is, my husband -- my husband's contributions to

14  law enforcement within our state are extraordinary, and such is

15  acknowledged before this Court, by the honorable governor,

16  another former superintendent of the state police, and former

17  head of the Secret Service for the State of Maryland, who is

18  present in this courtroom today.  My husband has spent more

19  than a decade devoting himself to the citizens of Maryland and

20  has been recognized for saving lives on countless occasions.

21  My husband has served in many capacities of law enforcement

22  within our state.  One of those such capacities was as a

23  hostage negotiator where he successfully negotiated the safety

24  of many adults and children over the years who would not be

25  here today if it was not for his actions of courage.  He has

received a plethora of commendations ranging from bringing to justice some of the most violent fugitives to placing himself in the midst of gunfire to save the lives of innocent bystanders.

It is easy for us to forget all that he has sacrificed, and instead judge him based a single spontaneous act that snowballed. My husband has accepted responsibility for his actions. And over two years passed before any charges were brought against him. During the years that passed after this incident, my husband was not involved in any wrongdoing other than that which has connected to the original incident. This shows that the theft was out of the ordinary. And instead of engaging in other wrongdoing, my husband, in the following years, received commendations and rose to positions in greater responsibility due to his work ethic and dedication to the citizens of our state.

I make no excuse, nor does my husband, for his actions. He has accepted responsibility and will forever live with the consequences of his actions. I ask you to move forward in sentencing my husband, that you take a holistic approach, taking all of these facts into consideration, and that sentencing my husband for a long period of incarceration does nothing but victimize me further.

I understand Your Honor is outraged by my husband's conduct and, as such, he shall and will pay a heavy price for

the rest of his life, as he has already lost everything.  My

husband has already learned from his mistake, and I

respectfully request that you consider such, in determining his

sentence and possible leniency.  Thank you.

**THE COURT:**  Thank you.

Mr. Levin.

**MR. LEVIN:**  Thank you, Your Honor.

Your Honor, I wasn't planning to address Ms. Green's

comments first, but I think I have to because they may color

the entire proceeding and I think it's worth noting.

First of all, it's terrible what Mr. Green has been put

through.  I don't think anybody doubts that.  And the death

threats are inexcusable and outrageous.  However, Your Honor,

the death threats are a result of the fact that Mr. Ulbricht

learned that Mr. Green was cooperating.  They are not because

Mr. Green allegedly had stolen bitcoins.

**THE COURT:**  How do we know that?

**MR. LEVIN:**  Well, Your Honor, if I may, I have a chat

between Russ Ulbricht and Carl Force.  And this is shortly

after --

**THE COURT:**  I have to tell you, quite honestly, I don't

think that is particularly significant.  It could have exposed

him to very serious threats and consequences.  Whether or not

it actually is the motivation behind the threats, okay, I'll

assume for purposes of discussion it isn't the direct

1    motivation.  But you're not disagreeing with the simple fact

2    that it put Mr. Green in harm's way.

3        **MR. LEVIN:**  I'm not disagreeing with that at all,

4    Your Honor.

5        **THE COURT:**  So whether or not the threats that he

6    actually received emanated from the understanding that

7    Mr. Ulbricht reached that he was cooperating or because of the

8    theft, I'm not sure is of great consequence.  But go ahead.

9        **MR. LEVIN:**  Well, candidly, Your Honor, I feel like the

10   Court's being misled when it is told that because of the theft

11   Mr. Ulbricht wanted to kill Mr. Green.  That is simply not

12   true.  In fact, in a chat between Mr. Ulbricht and Carl Force

13   shortly after the theft, Mr. Ulbricht writes to Mr. Force --

14   This is Ulbricht:  "If you can get someone to force him" --

15   meaning Mr. Green -- "to return the stolen funds, that would be

16   be amazing."

17       Mr. Force:  Personally, I don't want any contact.  I'm

18   clear.  If you want something done, I can help you discreetly.

19       Mr. Ulbricht:  What do you mean?

20       Mr. Force:  Do you want him beaten up, shot, just pay the

21   visit?

22       Mr. Ulbricht:  I'd like him beaten up and forced to send

23   the bitcoins he stole back.  Sit him down at his computer and

24   make him do it.

25       Then he writes:  Beat him up only if he doesn't comply, I

1    guess.

2        It's only later, when Mr. Ulbricht learns -- because

3    local law enforcement in Utah disclosed the fact publicly that

4    Mr. Green had been arrested -- that Mr. /OL brick learned of

5    the arrest and worried that he was cooperating, and that's when

6    Mr. /OL brick writes to Carl Force.  "He was on the inside for

7    a while, and now that he's been arrested.  I'm afraid he'll

8    give up information."  And that led to Mr. /OL bright wanting

9    to have him murdered.

10        It's inexcusable what Mr. /OL brick did, it's inexcusable

11    that Mr. Bridges stole the bitcoins, but frankly, Your Honor, I

12    think the Court's being misled when it's told that the threats

13    of murder were a result of the stolen bitcoins.

14        **THE COURT:**  Is also inexcusable for a federal agent to

15    put a cooperating witness in that kind of situation, whether or

16    not anybody acts upon it.  It's utterly inexcusable.

17        **MR. LEVIN:**  We're not disagreeing, Your Honor.

18        **THE COURT:**  Well, then, I understand your point, that I

19    need to take it into context and realize other things were

20    going on.  And I take your point.

21        **MR. LEVIN:**  And we heard today that bitcoins were

22    transferred to Mr. Green's account.  This is the first we're

23    hearing it.  That's not in the plea agreement.  I don't know

24    that that's accurate, that Mr. Bridges somehow transferred

25    bitcoins into Mr. Green's account.  We know from charts that

were attached to the criminal complaint that Mr. Bridges stole bitcoins and transferred them to Mt. Gox.

So today's the first time I'm hearing -- and we object to it -- any suggestion that Mr. Bridges transferred bitcoins to Mr. Green's account.

And today is the first day, first time, I'm hearing that Mr. Bridges lied on May 28th, 2014, or lied on November 14th, 2014, or -- in fact, what Mr. Bridges agreed to in the plea agreement is that he misled agents on those dates and what he misled them about was his role. So he never says he lied, but he didn't confess, Your Honor. So he has accepted responsibility that he misled the agents who were interviewing him because he did not confess to the theft, but today we're hearing he lied. Whereas, what he agreed to and what the government agreed to is that he misled. And our position is he did -- he did not confess at that time, although he did confess the very first day he appeared in this court.

Your Honor, there is little doubt that sentencing is the most difficult part of your job, if I can say that. I just think it must be. Because it's not like ruling on a motion that either the law is there or not, or a verdict -- if there's a bench trial -- the facts and the law come together.

But here -- Your Honor has done this many times -- has to look. And I know you do because Your Honor has indicated you've looked at everything. And I know you listened to our

witnesses and you're not just going to sentence on the crime but also bear in mind the actor and his past accomplishments, his future, his future potential, his efforts to rehabilitate, along with many other factors.

And if Your Honor were just going to sentence him on the crime, we wouldn't need a hearing; we could just ask the government what he should get and be done with it. That's not how we do it.

So I appreciate the fact that Your Honor has a very difficult job and will consider all the relevant factors. And that's why I do bring up these points, Your Honor. Because I don't want to leave here knowing that I could have said something -- even if it's not relevant, necessarily, to Your Honor's analysis -- we don't want the Court to be misled.

And with respect to the charge, Your Honor, there's little that I can say that would lessen the seriousness of Mr. Bridges's actions. And there are no excuses. We're not making excuses, Mr. Bridges has not made excuses. And, from the first day he appeared in the courthouse, he spoke with the prosecutors.

Mr. Bridges knows he acted foolishly. That's an understatement. But -- he knows that he acted foolishly when he stole the bitcoins. But he's not a fool. He knows his actions affected the integrity of the judicial system, his actions violated the trust that his government placed in him,

and he has acknowledged all of that. He's acknowledged a lot, Your Honor.

And when Mr. Bridges was finally charged and he came in, he knew, like any defendant, Your Honor, he had three options: He could plead guilty; he could plead guilty and cooperate; or he could force the government to meet its burden.

In a sophisticated case, as Your Honor has indicated, this would not have been an easy case to try. Frankly, the state -- the Northern District of California, I don't believe, had jurisdiction over money-laundering charges, but Mr. Bridges waived any issues with respect to venue and agreed to have everything resolved here. That saved the government tremendous resources and efforts. Obviously, it helped Mr. Bridges too. We don't deny that. But there was a benefit there to the government having Mr. Bridges come in on the very first day and allowing prosecutors, busy prosecutors, to move on to other cases.

So Mr. Bridges knew he had three choices. He didn't waste any time making that decision. He'd spent two years waiting for this day to come, and the day came. And he knew right away he was going to plead guilty and cooperate.

And he did try to cooperate, Your Honor, not so much for the purpose of the 5K. Usually a 5K, as Your Honor well knows, is when you can give the government somebody else. And Mr. Bridges knew he couldn't give the government somebody else.

But, still, the government indicated, even knowing that he was a lone actor, would assist the government because then they knew they could stop looking, that he wasn't in cahoots with somebody else. And he came in and he acknowledged what he had done in Utah in January of 2013 and so he gave -- Mr. Bridges gave the government --

THE COURT: Let me just ask you. I want to make sure I understand this. Beyond finally fessing up, what did he -- are you contending he provided some sort of additional assistance to the government?

MR. LEVIN: Well, what the government told him before he even proffered -- and what I've tried to indicate -- is that he did this by himself. The government didn't know if he had been working with other people to launder the funds.

THE COURT: I see.

MR. LEVIN: And there was value -- the prosecutors even said there was value in knowing that he acted alone. So that's -- that's the point, Your Honor.

THE COURT: All right. I understand.

MR. LEVIN: Okay. So I understand Your Honor's point -- well, when he finally fessed up -- Your Honor, my position is having done this on both sides as a federal prosecutor and defense attorney, this wasn't, finally, fessing up; this was coming in earlier, the very first day he's charged.

Now, usually people don't come in and confess during the

1    investigation; it's after they're charged.  And once he was

2    charged he immediately made the decision to plead guilty and

3    try to cooperate.

4         So now unfortunately, on March 30th, the day Mr. Bridges

5    appeared and he spoke to law enforcement, he misled them.  And

6    he's acknowledged that in the plea agreement.  He tried to

7    hide -- I won't say her name, but there's a reference to "EP."

8    And he tried to hide EP's activities as a Secret Service

9    employee.  She wasn't permitted to allow Mr. Bridges access to

10   FinCEN.  She did, and unfortunately he did try to protect her,

11   and he's acknowledged that in the plea agreement.

12        Still, he did eventually do everything that one would

13   hope he would do after March 30th.  He signed a plea agreement;

14   he pled guilty; he waived venue; he returned all the money he

15   could.  And I don't think that can be overstated.

16        He didn't -- he didn't use the money to travel, to fund

17   extravagant parties, to eat particularly well, to eat well at

18   all.  Your Honor can see that he's skin and bones.  He

19   doesn't -- he didn't use this money and enjoy it.  He was

20   stressed for two years after he stole it.  It was sitting in

21   the account.  He paid taxes.  And for that, Mr. Bridges, he

22   can't win for losing, as they say.  Either he pays taxes -- and

23   the argument is he was trying to make it look legitimate -- or

24   he doesn't pay taxes and he's trying to cover his trail.

25        But he did pay taxes.  And, for that, there is something

1    to be said for that, Your Honor.

2        So all of the money that was available has been returned,

3    I believe.  I mean, I base that on helping facilitate that

4    process with the Asset Forfeiture Section of the Northern

5    District of California.  Some money was simply lost because of

6    the marketplace.  As a result of capital losses, there's not

7    the original $850,000.  And this point perhaps it's -- it's

8    worth noting -- I know Your Honor's well aware of this -- that

9    Mr. Bridges stole $350,000 worth of bitcoins.  Because of the

10   market that went up.  And but for that, we'd be looking at a

11   guideline range two levels lower.  I think it's 46 to 57

12   months.

13       And so when fashioning a fair sentence -- and I'll try

14   not to repeat this later -- we just ask that Your Honor

15   consider the fact that the guidelines are what they are because

16   of something that was completely out of the control of

17   Mr. Bridges.

18       If they had risen -- if the bitcoins had risen to a value

19   of ten million dollars, I'd be making the same argument.  If

20   they had decreased to a minimal value, I think the government

21   would be making an argument that we should be looking at

22   something higher because that's the value of the bitcoins when

23   he took them.

24       Your Honor, I don't know that this needs further

25   addressing, but the government does make the -- think the

1    suggestion that Mr. Bridges was hoping to wipe his computer by

2    placing it where he placed it, I think that's being covered by

3    Ms. Golden.  But that's really Mr. Bridges's own fault, that

4    he's now in the position that everything he does is looked at

5    with suspicion.  And that's something Mr. Bridges has put upon

6    himself and he will continue to have to deal with that the rest

7    of his life.  Every time he does something, there's going to be

8    this cloud of suspicion over him.  Rightly or not.  I mean,

9    sometimes, sure, that's why we consider people's criminal

10   history when they apply for a job, is that is this person going

11   to be honest?  Can we trust this person when he comes to work

12   with us?

13        Just during the pendency of this case, Your Honor, every

14   time Mr. Bridges does something, it's questioned, it's not

15   believed by the government, even when we have documentation to

16   demonstrate otherwise.  For instance, with respect to reporting

17   a crime -- Mr. Bridges was the victim of a crime in Maryland --

18   he reported it right away to Baltimore city.  He filed a police

19   report, he contacted the credit card companies to find out if

20   there was any use of the credit cards, he asked for a credit

21   report.  This was all within a matter of days, two weeks before

22   he was asked to come into the federal courthouse for a hearing

23   or even knew that this was an issue.

24        And I say this now -- and I realize that this is really

25   going to go to the issue of self-surrender -- but everything he

1    does now falls under this cloud of suspicion, even though he

2    was a victim of a crime.

3        And it's not even clear what the government's theory was.

4    And the magistrate judge, frankly, recognized that it wasn't

5    clear what the government's theory was.  He was reporting a

6    theft for what purpose?  So that he could try to get a

7    replacement ID that would allow him to do what?

8        None of it really made sense, if Your Honor looked at it

9    with -- and the judges that heard that couldn't quite

10    understand -- in my opinion, they couldn't quite understand

11    what the theory was.  But that's on Mr. Bridges for putting

12    himself in this position.

13        Another example, Your Honor, would be the fact that two

14    days after the last transfer of money was made from Mt. Gox to

15    Fidelity Mr. Bridges served -- was the affiant on the seizure

16    warrant.  The two -- the two events had nothing to do with each

17    other.  The fact that there was a transfer was already in

18    place; it was automatic.  And it was only days before the

19    seizure warrant that Mr. Bridges was notified -- and the

20    government knows this.  Only a few days before the seizure

21    warrant, Mr. Bridges was notified he'd be the affiant.  He had

22    no choice in the matter.  He was told he would do it.

23        **THE COURT:**  It's rather coincidental.  I mean, seriously.

24    It's -- within a very short period of time he knows he's going

25    to be an affiant on the seizure warrant, and the funds he knows

that he claims are in there, he gets out before that.

I mean, it's pretty --

MR. LEVIN: He doesn't get them out -- I understand, Your Honor, but he doesn't get them out. That's part of being under this cloud of suspicion. It's automatic. Once the --

THE COURT: Well, he's putting it all in motion. I mean, he -- are you saying he has no idea this can happen to his funds? Granted, he doesn't have to trigger the actual event. I understand your point. But he's also not clueless that it's going to happen.

MR. LEVIN: He knows that in January of 2013, when he set up the account at Mt. Gox, that Mt. Gox allowed him to place a ceiling on the funds so that because Mr. Bridges used his own identification Mt. Gox set in place that every time the bitcoins reached a value of a hundred thousand dollars automatically they would be transferred to Fidelity.

So he was involved, he was passively involved, because he didn't know when it would reach a hundred thousand dollars. And each time it did it was transferred to Fidelity. It is a coincidence that the same month the last transfer is made he's an affiant. But he didn't decide to be the affiant. He was appointed to be the affiant only days before the actual seizure warrant was served. And by being the affiant, he did nothing to affect the investigation. He didn't try to hide his account.

So again, these do look suspicious, but the two events are not related to one another. But again, because of what he did in stealing the bitcoins, he's forever going to be looked at with this suspicious glance.

In the same vein, Your Honor, it's my understanding, based on the discovery, that it was Mr. Bridges who helped turn in Carl Force. By turning in Carl Force -- if my understanding is correct from the review of the discovery -- I think that was in the complaint -- if that's correct, then Mr. Bridges really caused his own -- his own downfall. Because once Mr. Carl Force was being investigated, ultimately Shaun Bridges was investigated.

So I harken back to what Mr. Bridges's wife said, that even after his misconduct he tried to work hard and tried to work with some ethics, Your Honor. And, in fact, he was still -- Mr. Bridges is the one who reported Carl Force to his supervisors at the Department of Justice. And that ultimately led, I believe in part, to Mr. Bridges being uncovered as having taken the bitcoins.

In their sentencing memo the government suggests that Mr. Bridges's misconduct went on for months, if not years. Your Honor, that's -- that's an exaggeration. His misconduct occurred in January 2013. The transfer of monies occurred for a period of two months thereafter. That's a couple of months. That's not -- and again, we're not standing here, Your Honor,

saying, "Oh, it's okay because it only occurred for two
months."  I simply don't want the Court to read something --
and I know that you gave the Court -- the prosecutors some
pushback this morning on an overstatement of perhaps there are
cases outside this jurisdiction that failed because of
Mr. Bridges's actions.  But Your Honor pushed back, and perhaps
not solely because of Mr. Bridges's conduct.

So it doesn't -- it certainly doesn't make Mr. Bridges's
conduct right, but it is more of a one-off in the continuing
course of misconduct for years that Your Honor saw in the
Carl Force case.

To be sure, none of this lessens the seriousness of
Mr. Bridges's actions.  But I hope it suggests that Mr. Bridges
acted impulsively in January 2013, and at least since April of
2015 he's done everything he could do to make amends.

And that leads us to looking at Mr. Bridges, the person,
and not Mr. Bridges, the criminal.  Although he will be forever
defined for his actions in January 2013 as a criminal, there's
an entire life before that night that is worthy of
consideration.

I know Your Honor's read the sentencing memo and will
consider Mr. Bridges's contributions both before and after his
extraordinary lapse in judgment.  But he is a great deal more
than what has bought him into this courtroom, and the
collateral consequences his actions are, for him, not so

collateral.  He's lost his profession, his livelihood, his

reputation, been a national disgrace.  There will be a

continued national disgrace after today's hearing.  He'll lose

his freedom.  And while he's serving his term of imprisonment,

his conditions will be much harsher than those of the average

prisoner.

I think Your Honor is well aware of that because of his

status of a former law enforcement officer.  And I've certainly

represented a number of law enforcement officers who have been

sent to Bureau of Prisons, and their conditions of confinement

are much worse.  They do stay in solitary confinement for many

hours during the day.  It's for their own protection.  But it

doesn't make it any easier.  It's a harsher period of

confinement.

We ask that Your Honor consider all of that in imposing a

just and fair sentence, Your Honor.  Thank you.

**THE COURT:**  Thank you.

Mr. Bridges, this is your sentencing.  You have a right

to speak directly to me.  You're not required to do so; it's

totally your choice.  But if there is anything that you wish to

say, now would be the time to say it.

**MR. LEVIN:**  May he have a moment?

**THE COURT:**  Yes.

**MR. LEVIN:**  Your Honor, there are a few things

Mr. Bridges would like me to share with the Court, and then I

1    think he does also wish to speak, if that's permissible.

2    **THE COURT**:  All right.

3    **MR. LEVIN**:  This is not a sentencing hearing for

4    Mrs. Bridges, as Your Honor already indicated.  But when I went

5    through the consequences, the collateral consequences to

6    Mr. Bridges, in addition to those --

7    Incidentally, Your Honor, by losing his job Mr. Bridges

8    had no health care.  He had been in a relationship with

9    Ms. Esposito, and they decided, in large part -- not only

10   because they were in love -- but they decided to get married so

11   that Mr. Bridges could get health care coverage.  In fact, he

12   has medical issues, which we can talk about after sentencing,

13   in terms of issue of self-surrender.

14   But that's why they got married, and that's why I felt

15   like it was important to point out that Mrs. Esposito did speak

16   with the prosecutor and it was only upon the advice of counsel,

17   when prosecutors indicate they did not believe her and wanted

18   her to appear in front of the grand jury, that Ms. Esposito

19   invoked her marital privilege.

20   What Mr. Bridges would like me to point out, Your Honor,

21   is that, at the time, Ms. Esposito was going through Maryland

22   State Trooper Academy training to be a Maryland State Trooper.

23   When Ms. Esposito returned to Maryland after having flown out

24   to San Francisco, she was informed by her supervisors at the

25   academy that they had learned she had invoked her marital

privilege and they terminated her.

Ms. Esposito has an employment lawyer and she is trying to get her job back.  But the point is that among the other collateral consequences are the fact that somehow word got out from San Francisco to the Maryland State Troopers that Ms. Esposito had invoked her marital privilege.

Your Honor, at this point I do believe Mr. Bridges would like to be heard.  Thank you.

**THE COURT:**  Very well.

Mr. Bridges.

**THE DEFENDANT:**  Do pardon me, Your Honor, because, obviously, I did not prepare a statement, as I was not planning on speaking today.  But I did want to share a few things.

I obviously have lost a lot.  I had a very illustrious career, graduated top of my class from the state police, top of my class from the Secret Service.  Not too many people can say the governor is willing to write a letter on their behalf.

So I'm very proud, at least of my past before this, this moment that I'm here before you today for.  I've lost a lot. I've accepted responsibility.  And I don't deny that and I don't diminish any fact of that.  I expect you to give me a likely period of incarceration.

My wife lost her employment.  I gave up an illustrious career.  I owe all this money.  Though I never spent a penny of it, I have to pay back money to the Department of Justice that

1    I paid, for taxes to the state of Maryland.  There's two

2    different departments.  So I owe more money, technically, than

3    I've even taken.

4        I just want to at least address, for your own

5    clarification, just a few issues that the government brought

6    up.

7        This entire investigation began when I was notified about

8    criminal activity of Carl Force.  An international coin

9    exchange contacted me, personally notified me about

10   Carl Force's criminal activity.

11       Within two hours of being notified I had elevated it

12   through the chain of command and reported it and instructed

13   this foreign institution to file what's referred to as a

14   "Suspicious Activity Report" on Carl Force.  That is what began

15   this entire investigation.

16       Within the coming days, Ms. Haun called me at my personal

17   residence to discuss the report that was filed on Carl Force.

18   And that is what ended up leading to my own downfall.  Knowing

19   such, I had lived with this burden for two years.  I could

20   never spend any of it.  I knew when I turned in Carl Force that

21   it would ultimately lead to me.  I mean, the person turning him

22   worked with him; they're obviously going to look at me.  But I

23   accept that.  I don't diminish one bit of it here.

24       I just want to also address the Mt. Gox issue, since you

25   just brought that up with them.  The government knows this.

1     I've turned over an email to them.  I was assigned that seizure

2     within a week of doing that seizure.  And Mt. Gox did

3     approximately a hundred million dollars a month.  Their

4     business didn't cease operation after that seizure.

5     And the only reason I say that is, again, not in any form

6     to diminish my actions, but the allegation that it was somehow

7     timed, the money could be have been withdrawn after the

8     seizure.

9     I mean, it didn't affect their operation.  They moved a

10     hundred million dollars a month and we seized two million.

11     But I wanted to be clear that I accept full

12     responsibility.

13     I think the people that flew all the way here from

14     Baltimore to speak on my behalf, Ms. Golden and my wife, who

15     is -- she's lost everything.  She went to college to be in law

16     enforcement and now she's lost it all.

17     Again, I didn't have anything prepared, but I at least

18     wanted to apologize to everybody.

19     Thank you.

20     **THE COURT:**  Thank you.

21     Mr. Levin, anything further?

22     **MR. LEVIN:**  Nothing further, Your Honor.

23     **THE COURT:**  All right.

24     **MR. LEVIN:**  Should we have a seat or --

25     **THE COURT:**  Yes, you may.

1    Anything further?

2    **MS. HAUN:**  Your Honor, very quickly, just for the record.

3    Because we are creating a record, Mr. Evans and I, we can

4    respond to a number of things.  We won't.  I know we're running

5    short on time.

6    Just three brief things.

7    One, the understanding Mr. Levin had about the

8    investigation into Carl Force started coming from Mr. Bridges.

9    That's not correct.  I'm not going to get into, in open court,

10   how our investigation began, but it was not -- it was but for

11   Mr. Bridges, not because of Mr. Bridges.

12   The second thing we just wanted to clarify about,

13   Mr. Levin commented about putting into context, and he read a

14   text message.  That's one of dozens and dozens of text

15   messages.  And I want the Court to know that we've been fully

16   forth- --

17   **THE COURT:**  This is a point about Mr. Green?

18   **MS. HAUN:**  Yes.  And we've been fully forthcoming with

19   the Court, and you heard from Mr. Green himself, there were a

20   number of other text messages that Russ Ulbricht sent with his

21   employees of the Silk Road -- and not just Force -- after the

22   message that you heard from today.

23   So we do believe that one of the primary reasons -- and

24   we continue to believe one of the primary reasons that there

25   was a hit put out for Mr. Green was because of Mr. Bridges's

conduct.

And finally, Your Honor, we heard from Mr. Levin that Mr. Bridges tried to cooperate with the government, he came fully clean, he told us everything.

Your Honor, there were about six federal agents and three federal prosecutors and he tried to tell us that actually he didn't steal Mr. Green's money or that 21,000 bitcoins, he only stole part of it. He actually -- I won't tell you who he said stole the first couple of transactions, but he actually said -- and he might even continue today to sit here and tell you -- that he didn't make the first two transfers out of Mr. Green's account and that someone else did those. And he blamed another individual for those.

So for him to say that he cooperated with the government in this proffer session, Your Honor, the government feels quite differently about whether or not he was forthcoming, and we certainly don't think he cooperated in the investigation.

And we just wanted to make those points for the record.

And I think that's -- that covered it.

**MR. EVANS:** Just the fact that it was not a cooperation agreement, Your Honor; it was a straight-up employment.

**THE COURT:** I understand. Very well.

Applying the factors that are set forth under 18 USC 3553(a), this is the point where the statute directs me to determine a sentence which is sufficient but not greater than

1    necessary.  This, to me, is an extremely serious crime

2    consisting of the betrayal of public trust by a federal law

3    enforcement agent.  And from everything I see, it was motivated

4    entirely by greed.

5         Mr. Bridges engaged in what I think is a sophisticated,

6    thought-out scheme in which he stole substantial sums of money.

7    And he attempted to cover his tracks, which in one of the most

8    significant factors to me -- and I appreciate Mr. Green having

9    come forward -- as I said before, it is inexcusable for a

10   federal agent to put a cooperating witness at risk in the

11   fashion that was done here.  Whether or not there was actual

12   threats that emanated from it, to me, that's not the central

13   point.  The central point, again, is the extraordinary betrayal

14   of public trust that could -- could very possibly have gotten a

15   person killed.

16        I think in the interest of deterrence, both general

17   deterrence and as to Mr. Bridges as an individual, and to

18   promote respect for law, no departure or variance is warranted

19   in this case.

20        Now, I acknowledge Mr. Bridges's earlier years of service

21   with law enforcement, but nothing in that background I think

22   excuses or mitigates what is to me a shocking and reprehensible

23   abandonment of his public duty.  And I similarly find the

24   references in Dr. Bloomberg's report to alcohol issues and

25   depression issues simply unconvincing, in this context, as a

1    mitigating factor. I seldom find myself in the position of

2    imposing a high-end guideline sentence, but I think it is

3    required in this case.

4         Any legal reason why sentence may not be imposed at this

5    time?

6         **MR. EVANS:** No, Your Honor.

7         **MR. LEVIN:** No, Your Honor.

8         **THE COURT:** Pursuant to the Sentencing Reform Act of

9    1984, it is the judgment of the Court that Shaun Bridges is

10    hereby committed to the custody of the Bureau of Prisons to be

11    imprisoned for a term of 71 months.

12         This term consists of terms of 71 months on Counts 1 and

13    2, all counts to be served concurrently.

14         The Court recommends that the defendant participate in

15    the Bureau of Prisons' Residential Drug Abuse Treatment

16    Program.

17         Upon release from imprisonment, the defendant shall be

18    placed on supervised release for a term of three years. This

19    term consists of terms of three years on each of Counts 1 and

20    2, all such terms to run concurrently.

21         Within 72 hours of release from the custody of the Bureau

22    of Prisons, the defendant shall report in person to the

23    probation office in the district to which the defendant is

24    released.

25         While on supervised release, the defendant shall not

1    commit another federal, state, or local crime, shall comply

2    with the standard conditions that have been adopted by this

3    Court, shall refrain from any unlawful use of a controlled

4    substance and submit to a drug test within 15 days of release,

5    on supervised release, and two periodic drug tests thereafter,

6    and shall comply with the following conditions:  One, the

7    defendant shall participate in a program of testing and

8    treatment for alcohol abuse as directed by a probation officer

9    until such time as the defendant is released from treatment by

10   the probation officer.

11         The defendant is to pay part or all of the cost of this

12   treatment in an amount not to exceed the cost of treatment as

13   deemed appropriate by the probation officer.

14         Payment shall never exceed the total cost of urinalysis

15   and counseling.  The actual copayment schedule shall be

16   determined by the probation officer.

17         Two, the defendant shall abstain from the use of all

18   alcoholic beverages.

19         Three, the defendant shall pay any special assessment

20   that is imposed by this judgment and that remains unpaid at the

21   commencement of the term of supervised release.

22         Four, the defendant shall provide the probation officer

23   with access to any financial information, including tax

24   returns, and shall authorize the probation officer to conduct

25   credit checks and obtain copies of income tax returns.

1    Five, the defendant shall submit his person, residence,

2    office, vehicle, or any property under his control to a search.

3    Such a search shall be conducted by a United States Probation

4    Officer at a reasonable time and in any reasonable matter based

5    upon reasonable suspicion of contraband or evidence of a

6    violation of a condition of release.  Failure to submit to such

7    a search may be grounds for revocation.

8    The defendant shall warn any residents the premises shall

9    be subject to searches.

10   Six, the defendant shall not have any contact with any

11   co-defendant in this case, namely, Carl Mark Force IV.

12   Seven, the defendant shall cooperate in the collection of

13   DNA as directed by the probation officer.

14   Eight, the defendant shall not own or possess any

15   firearms, ammunition, destructive devices, or other dangerous

16   weapons.

17   It is further ordered the defendant shall pay to the

18   United States a special assessment of $200, which shall be due

19   immediately.

20   When incarcerated, payment of criminal monetary penalties

21   are due during imprisonment at the rate of not less than $25

22   per quarter, and payments shall be through the Bureau of

23   Prisons' Inmate Financial Responsibility Program.

24   Criminal monetary payment shall be mailed to the clerk of

25   the US District Court, 450 Golden Gate Avenue, Box 36060,

1    San Francisco, California, 94102.

2        The defendant's interest in the following property shall

3    be forfeited to the United States.

4        The defendant's interest in the property to be forfeited

5    is $165,529.88 from Fidelity brokerage account held in the name

6    of Quantum Investments, 306,000 held in trust in the attorney

7    of record's name, $4,745.92 from PNC bank account, jointly-held

8    in the name of Shaun Bridges and a person known to the parties,

9    and 651,000 monetary judgment.

10        I do find that the defendant does not have the financial

11    resources to pay a fine and order that the fine be waived.

12        The next question that we need to address is the

13    surrender question.  What's the government's position?

14        **MR. EVANS:**  Your Honor, given the length of the custodial

15    sentence that the defendant has just been sentenced to, the

16    government moves to have the defendant remanded into custody at

17    this time.  The government does not doubt that Mr. Bridges, at

18    this point in time, is suffering from depression, as his

19    physician has indicated; he's also indicated there's issues

20    with alcohol and so forth and those are factors to be

21    considered in terms of public safety and safety of the

22    defendant himself.

23        We think that those issues are taken away, taken off the

24    table, if the defendant is remanded into custody at this point

25    in time.

1       Just in terms of -- the Court made reference earlier --

2   and I think it was discussed earlier about, you know, the fact

3   that he, Mr. Bridges -- when he went in to make a police

4   report, he didn't, in fact, file a police report.  He indicated

5   at that point in time that he just wanted a case number, and

6   didn't, in fact, want to file a police report.

7       So there are certain issues that go with -- whether it's

8   changing the Social Security number on the name, all these

9   things the Court has heard before which give the government

10  continued concern about his possible intention to flee and

11  possible safety risk to himself and the community.

12      We think all those things mitigate toward remanding the

13  defendant into custody at this point in time.

14      **THE COURT:**  The second issue that arose in the pretrial

15  release context involved trying to get some Maryland State

16  Police records.  Whatever happened with that?  I know there

17  were proceedings in front of the magistrate judge, I believe

18  in -- initially, in Baltimore, and then video conference with

19  Judge -- I guess it was James here.

20      **MR. EVANS:**  There was an audio conference or a hearing

21  held by the magistrate judge out here in San Francisco,

22  Your Honor, in which the judge increased the defendant's

23  presentencing confinement or presentencing release conditions

24  in which he additionally instructed or placed him on home

25  confinement and restricted him to any access to computers and

1    prevented him from actually leaving his home other than to meet

2    with his attorney.

3         THE COURT:  In terms of assessing whether or not

4    Mr. Bridges is either a flight risk or a danger to himself,

5    not, I don't think, danger to others, is really implicated

6    here.  Why are those incidents indicative of something that I

7    should take into account?  Why do they cause you -- I

8    understand your point that he now -- Mr. Bridges knows the

9    significant sentence that he does indeed face, and that is

10    certainly something to take into account.  And some of the

11    issues that you mentioned before with respect to mental

12    health/alcohol issues.

13         But the pretrial release problems, if you will, that he

14    had, why are those indicative of a greater flight risk?

15         MR. EVANS:  Your Honor, the point I'm trying to make in

16    that is the fact that the government has sought his detention

17    for some time now, since back in, I think, July.

18         THE COURT:  Well, I understand that, but what I'm trying

19    to get at is -- I know that was the position you took, but is

20    that because you thought these -- this activity was in the

21    process of trying to get identity to leave the country or --

22         MR. EVANS:  Yes, Your Honor.  We thought that those

23    things could be connected with possible intentions to flee the

24    jurisdiction:  Trying to obtain a new Social Security number, a

25    new name; trying to have those shielded from law enforcement

1  and the courts.

2  We thought those were indications of possible attempts to

3  obtain additional or alternate identities or identifications

4  where he could then flee the jurisdiction.  We think that,

5  again, this is one of those cases where defendant has complied

6  with the restrictions placed on him by the Court; however, the

7  sentence has now been handed down, it is a lengthy prison

8  sentence that defendant is looking at at this point in time.

9  And because of those concerns, ongoing concerns, that the

10  government has had since this summer about possible attempts to

11  flee -- as well as the latest revelations about his mental

12  state and his abuse of alcohol -- we think that all of those

13  issues point toward remanding the defendant into custody at

14  this point in time, and the onus is on Defendant at this point

15  in time to show why --

16  **THE COURT:**  Mr. Bridges has known -- by virtue of his own

17  counsel's sentencing brief, he's known he's going to face a

18  substantial sentence.  And so the -- the defense position was

19  not less than 36 months.

20  So he's had it in mind that that's out there, that that

21  was -- I think -- I suspect he walked in today with the

22  understanding that a custodial sentence was going to be imposed

23  and yet he's made his court appearances, he's shown up.

24  So the fact that perhaps it is a longer sentence than he

25  has hoped to receive --

1    **MR. EVANS:**  I think it's significantly longer,

2  Your Honor.  I think the defendant was asking for 36 months,

3  and it's almost double that.  So we're looking at a significant

4  period of time.  Almost six years.

5        And for that reason, Your Honor, I think maybe the

6  calculus changes in defendant's mind.  But the government's

7  position has consistently been that release is not appropriate

8  in this case.

9        And now that he's been sentenced to 71 months

10  incarceration, the government feels more strongly than ever

11  that defendant should be remanded into custody at this point in

12  time, as opposed to allowed to self-surrender.

13        **THE COURT:**  Mr. Levin.

14        **MR. LEVIN:**  Thank you, Your Honor.  Mr. Bridges has

15  complied with all the terms and conditions of his pretrial

16  release.  He's been at every court appearance he's been told to

17  appear for.  The fact that he received a guideline sentence,

18  frankly, I think Mr. Bridges expected a guideline sentence.  I

19  think to some degree there's a relief now that it's behind him

20  and he can move forward by serving his sentence.

21        The fact that there was a -- that he has suffered from an

22  alcohol abuse problem, he sought counseling for that and has

23  been alcohol-free for -- I think 40 weeks, if I'm not

24  mistaken -- because he sought treatment for his alcohol

25  problem.  And now he has been locked down in his home and

1    there's no indication that his alcohol abuse has created an

2    issue while on pretrial release, Your Honor.

3         A couple of other points, if I may.  We're going to be

4    asking that Mr. Bridges be designated to a Bureau of Prisons

5    facility in Maryland.  FCI in Cumberland, specifically.  The

6    transfer from California to Maryland, when that occurs, while

7    we're waiting for that to occur, Mr. Bridges will no doubt be

8    in solitary confinement.  The transfer itself is a horrendous

9    ordeal, as I'm sure Your Honor is aware.  There's cost, also,

10   involved.  And while it may be minimum in the grand scheme of

11   government cost, it's still a cost that the government wouldn't

12   otherwise have to have borne, and -- or bear out.

13        So there's every reason to believe -- and Mr. Bridges has

14   strong support from his wife.  His mother-in-law is also here.

15   His former supervisor is here.  These are all people

16   Mr. Bridges knows he can rely on when he eventually gets out of

17   confinement.

18        But the fact is that he has complied with his conditions

19   and --

20        **THE COURT**:  Well, I suppose my bigger concern right now

21   is just you have -- doing your job, have presented to me some

22   issues of concern about his mental health, and also I now

23   appreciate your comments about the alcohol issue.

24        But that's -- it's -- I will be the first to acknowledge,

25   a big sword hanging over him at the moment, that he is going to

1    have to report to prison.  And I have some genuine concern

2    that -- you know, that that's perhaps going to be too much

3    to -- for him to deal with.

4         And so that's where my question is coming from.  If

5    you -- you've probably already addressed it, to the extent you

6    can.  But the issue of in the interim time period should he be

7    allowed to self-surrender, to have a confidence level that, at

8    the very least, there's not going to be any attempt to leave

9    the jurisdiction, but just is he in a mental position to be

10   able to tolerate this?

11        **MR. LEVIN:**  It's a fair question, Your Honor.  Two

12   responses.  First, I believe the statute says to consider

13   whether or not Mr. Bridges is a flight risk or a danger to the

14   community.

15        **THE COURT:**  True.

16        **MR. LEVIN:**  Not a danger to himself.

17        **THE COURT:**  Well, I guess the statute may not say that,

18   but I am concerned if people are a danger to themselves.  And I

19   don't know if the statute specifically lets me take that into

20   account, but I've got to tell you I do take that into account.

21        **MR. LEVIN:**  And that's why there's a second point,

22   Your Honor.  Dr. Bloomberg stated that he believed

23   Mr. Bridges's prognosis is excellent, and he indicated that

24   Mr. Bridges has indicated no suicidal ideations.  As I said,

25   for the two years between the theft and the charging, this

1   case -- the potential for a case like this hung over him -- I

2   believe I wrote -- like a sword of Damocles.

3       I think that is a bigger sword than the sword now facing

4   him, in terms of reporting to prison.  He knows for certainty

5   what he's going to get.  He knows that he might be eligible for

6   RDAP, which will help him.  He has every reason to behave and

7   earn good-time credit.  These are all things that Mr. Bridges

8   anticipates and wants to take advantage of certain programs.

9       As I said, I think Mr. Bridges, in some respect, is

10  relieved to finally have this day over with and he can then

11  prepare for serving his sentence, Your Honor.

12      **MR. EVANS:**  Your Honor, if I can just respond and remind

13  the Court that the statute uses the language "shall" in terms

14  of remand, absent extraordinary circumstances.  And given the

15  diagnosis of Dr. Bloomberg of a specified personality disorder,

16  insecure schizoid, impulse features and so forth, we're

17  concerned that that diagnosis is out there.

18      And again, because of the statute using the language

19  "shall" except in extraordinary circumstances, we don't believe

20  this is one of those cases that it falls into that category and

21  we think that it's best for the defendant and for general

22  public that he be remanded in custody.

23      And I will point out that the government's paying for his

24  transportation and stay out here regardless, as the Court has

25  granted motions for him to do that.  So whether he's

transported back by the marshal's service or he flies back, the

government is bearing the cost, Your Honor.

    **MR. LEVIN:**  The government does not pay for Mr. Bridges's

return to Maryland, Your Honor.  That was clear in Your Honor's

order.

    **THE COURT:**  I authorized his one-way travel here.

    MR. EVANS:  I apologize, Your Honor.

    **THE COURT:**  Okay.  All right.

    Is the matter submitted?

    **MR. EVANS:**  Yes, Your Honor.

    **MR. LEVIN:**  Yes, Your Honor.  Thank you.

    **THE COURT:**  I will allow Mr. Bridges to self-surrender.

Self-surrender also carries some significance in terms of, as I

understand it, Bureau of Prisons.  But it's a very close call

because I am -- I am troubled, I am concerned by the pretrial

conduct which struck me as -- if not indicative of flight, just

quite odd, and caused me concern.

    So, as I say, it's a close call.  But I am willing to

allow him to do that.  I will make the recommendation for the

facility in Maryland.

    But I want a short self-surrender date.  So I know they

may not have designated at the time that he surrenders, but he

nonetheless has to surrender.  So I'm looking for something in

January.  Do you have a suggestion for me?

    **MR. LEVIN:**  I have to look at what day of the week, but I

1    would ask for January 30th, Your Honor.

2        **THE COURT:**  Well --

3        **THE CLERK:**  That's a Saturday.

4        **MR. LEVIN:**  January 29th, Your Honor.

5        **THE COURT:**  All right.  And he would then surrender -- if

6    there's no designation at that time, he would have to

7    surrender, I believe, to the marshals in Baltimore?  Is that

8    where he would go?

9        **MR. LEVIN:**  That's correct, Your Honor.  Based on my

10   experience, that's correct.

11       **THE COURT:**  I think you're right.  All right.

12       **MR. LEVIN:**  Thank you, Your Honor.  We would ask for --

13   Mr. Bridges did serve -- between the time he was detained until

14   he was released after the hearing, back in Baltimore, he

15   served, I believe, five days.  We'd ask for five days' credit.

16       **THE COURT:**  I think that is a function of -- I don't

17   usually order that.  It's whatever the Bureau of Prisons

18   applies or doesn't.  And then, if there's an issue, I suppose

19   you can bring it up.  But I don't generally order that certain

20   time is credited or not.  I leave that for the Bureau of

21   Prisons to calculate.

22       **MR. LEVIN:**  I just wanted to have it on the record that

23   it was five days, if anyone looks at it.

24       **THE COURT:**  All right.

25       **MR. LEVIN:**  Thank you.

1    **THE COURT:**  Mr. Bridges, under paragraphs 4 and 5 of your

2    plea agreement it indicates that you have given up the bulk of

3    your appellate rights, with some of the limited exception

4    pertaining to the entry of the plea and ineffective assistance.

5    Not suggesting one way or the other if you have any

6    appellate rights remaining, if you do wish to file a notice of

7    appeal you need to do that 14 days from the entry of judgment.

8    You understand that?

9    **THE DEFENDANT:**  Yes, sir.

10   **THE COURT:**  All right.  Very well.

11   **MR. LEVIN:**  Thank you, Your Honor.

12   **MS. HAUN:**  Thank you, Your Honor.

13   (Proceedings adjourned at 1:02 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF CONTRACT REPORTER

I, Kelly Lee Polvi, certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of January, 2016.

_____
Kelly Lee Polvi
CA CSR No. 6389
Registered Merit Reporter
Federal Certified Realtime Reporter

*Kelly Polvi, CSR, RMR, FCRR*
*P.O. Box 1427*
*Alameda, CA 94501*
*503.779.7406; kpolvi@comcast.net*